THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
WILLIAM M. MILTON, Defendant- Appellant.

Second District Nos. 2—87—0521, 2—87—0612 cons.

Opinion filed May 4, 1989.—Rehearing denied June 14, 1989.

G. Joseph Weller and Patrick M. Carmody, both of State Appellate Defender's Office, of Elgin, for appellant.

Fred L. Foreman, State's Attorney, of Waukegan, and Richard L. Salon, of Chicago (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE WOODWARD delivered the opinion of the court:

Following a jury trial, the defendant, William Milton, was found guilty of armed robbery, robbery, and theft. The defendant then en-

tered a plea of guilty to a charge of robbery in an unrelated case. At a combined sentencing hearing, defendant was sentenced to 30 years' imprisonment on the charge of armed robbery and received a concurrent sentence of seven years' imprisonment on the robbery charge. Defendant appeals.

On appeal, the defendant raises the following issues: (1) whether defendant's motion for continuance should have been granted; (2) whether the jury should have been instructed on the defense of compulsion; and (3) whether the defendant's sentence was improper and/or excessive.

On April 6, 1987, defendant's case came up on the trial call. The assistant State's Attorney advised the court that he, in turn, had been advised by the assistant public defender representing defendant that defendant was going to accept a negotiated plea. However, it then appeared that private counsel had been obtained for the defendant. Defendant's new attorney, Burnell Dixon, introduced himself to the trial court and requested leave to file his appearance on behalf of the defendant. Dixon represented to the trial court that he had been contacted by the defendant's grandmother and told that defendant was dissatisfied with the public defender and that defendant wished to plead not guilty. The trial court stated that it would not talk to attorney Dixon because he was not attorney of record. After stating further that he would not continue the case, the trial court denied Dixon leave to file his appearance.

Later that day upon learning that attorney Dixon had filed his appearance on behalf of the defendant in the clerk's office, the trial court accused Dixon of flouting the court's previous order. However, the trial court ultimately accepted Dixon's appearance on behalf of defendant and granted the public defender leave to withdraw. The trial court then informed all parties that the trial in the case would commence on April 20, 1987.

On April 20, 1987, the State answered ready for trial. Defendant, however, presented a motion for continuance for 45 to 60 days on the basis that his attorney had not been able to interview Bernard Cobb, the codefendant in the case, who had recently been transferred to Joliet. The trial court inquired of the State if it intended to have Cobb testify against the defendant to which the State responded it did not know. The trial court then denied defendant's motion for continuance and informed all parties that the defendant's trial would commence in one hour.

When the case was called for trial, the defense counsel renewed his motion for continuance and stated that he had not received all of

the necessary discovery from the State. Defense counsel also informed the trial court that he wished to make oral motions to exclude statements made by the defendant and a black female witness. The trial court denied the oral motions, but stated that defense counsel could renew them prior to the witnesses being called during trial. The case was then continued to 1:30 p.m.

When the case was called at 1:30 p.m. for trial, the State informed the trial court that it had been advised by the defense counsel that the defendant intended to raise the affirmative defense of compulsion. The trial court asked if defense counsel had given the State notice of the raising of the defense of compulsion, to which counsel replied that he had given notice of it that day. There then ensued a colloquy between the trial court and defense counsel in which the trial court indicated that it was disturbed by the way defense counsel was proceeding in the case. The trial court indicated that while defendant here would receive due process of law and equal protection, the case would not be delayed. Defense counsel then indicated he would file a written motion raising the defense of compulsion, and the trial court granted him leave to do so.

After jury selection, defendant's trial commenced.

The testimony at defendant's trial revealed that the complaining witness, Dale Posedel, who had twice been convicted of burglary, was forced at gunpoint to enter the backseat of a car by a man he identified as the defendant. According to Posedel, defendant sat in the driver's seat; next to the defendant was a black female passenger; a black male passenger was in the backseat with Posedel. The male passenger emptied Posedel's pockets, placing the items in his own pockets. Eventually, Posedel was released and notified the police of the incident. He later identified defendant's picture from a group of photographs and identified him through a two-way mirror as the man who pointed the gun at him. Posedel also identified the gun found in the vehicle defendant was driving as the gun defendant possessed during the incident.

Acting on the description of a vehicle involved in a robbery which she had received in a dispatch, Waukegan police officer Margaret Ann Bartlett stopped the vehicle driven by the defendant. Both the defendant and his male passenger were frisked. When Officer Bartlett discovered an empty holster in the pocket of the male passenger, he fled the area. A gun was found in the front seat of defendant's vehicle, closer to the passenger side.

Officer John Moran of the Waukegan police department testified that on February 9, 1987, he was working on an armed robbery inves-

tigation, and at approximately 11:20 p.m., he interviewed the defendant. Defense counsel made an oral motion to suppress any statements made by the defendant. Following a hearing outside the presence of the jury, the trial court denied the motion.

Due to the issues raised in this appeal, it is necessary to set out the testimony regarding defendant's statement to police, as well as the testimony of the defendant and his witness in some detail.

After being advised of his *Miranda* rights and agreeing to speak to Waukegan police officer Paul A. Hendley, defendant related to Hendley that earlier in the evening of February 9, 1987, he had been at the home of Juan Mendesz. There he met a man by the name of Bernard. According to defendant, Bernard was the individual who ran from the scene after they were stopped by Officer Bartlett and was the individual who had the gun. Defendant and Bernard began driving around together and picked up a black female whose name defendant did not know. The female sat in front while Bernard sat in the backseat. Defendant told Hendley that they had become lost when they spotted an individual on a bicycle. The defendant specifically denied that he asked this individual for directions or that he pointed a gun at him. Defendant knew Bernard had a gun in his possession, for he saw it when he turned on the interior light in the automobile. Defendant further told Sergeant Hendley that this activity had not been preplanned but was spur of the moment.

After the State rested, Rolanda Hicks testified for the defense as follows. On February 9, 1987, she and the defendant drove to a friend's house. Bernard Cobb also arrived. She recalled that Cobb was drunk and was playing around in the house when he pulled a gun which he pointed at the room and at the defendant. She told the defendant that she wanted to leave, so defendant made the excuse that they had to return the automobile to the witness' mother. As they were backing out of the driveway, Bernard Cobb ran out of the house and sat in the backseat of the automobile on the passenger side, asking to be taken to his girlfriend's house. When defendant stated that they did not have much gasoline, Cobb told him he would get some gas. According to the witness, she was afraid of Cobb when he got into the automobile. As they proceeded, Cobb gave directions. Suddenly Cobb told the defendant to stop the automobile. Cobb then called to Posedel and told him to approach the automobile. Cobb also told the defendant to get out of the automobile. Defendant did as he was ordered and told Posedel to come to the automobile. According to the witness, the next thing she heard was the back door of the automobile opening and Cobb telling Posedel to get inside. Cobb ordered

the defendant to drive, and after a short period of time, she heard Cobb order Posedel to get out of the car. The witness stated she did not see anything in the backseat of the car because she was scared. After Posedel had left the car, the defendant started pleading with Cobb to be allowed to take the witness home. The defendant did take her home and told her he would be returning shortly.

On cross-examination, Miss Hicks acknowledged that she considered the defendant to be her boyfriend. She also professed her love for the defendant and her desire not to see him or anyone else get into trouble. She also acknowledged she had previously made a statement to Office Lou Moore of the Waukegan police department regarding this incident. She insisted that Officer Moore did not allow her to tell her side of the story. She also acknowledged that she did not tell the police that Cobb ordered the defendant out of the car, but that was due to her being afraid. She specifically stated that she did not tell Officer Moore that her boyfriend pointed a gun at Posedel.

Defendant testified to many of the same events that Miss Hicks testified to. In the defendant's opinion, Bernard Cobb was either high or drunk or both. Defendant observed Cobb wrestling with Mendesz and slapping him against the wall. Mendesz did not appear to want to fight back. Cobb then pulled a gun and began playing with it, twirling it around his finger. Cobb asked the defendant what he was going to do. Defendant responded that he was not going to do anything. Defendant recalled that he did not know if Cobb was going to shoot him. He was frightened for himself, as well as for his girlfriend, Miss Hicks. Miss Hicks whispered in his ear, and defendant then told Mendesz that they had to leave to return Miss Hicks' mother's car to her. As they were backing out of the driveway, Cobb came out and got into the rear passenger seat of the automobile and asked them to take him to his girlfriend's house. Defendant told Cobb that he did not have much gas, to which Cobb responded that he would give him gasoline money. After riding around awhile, they observed an individual on a bicycle. Cobb rolled down his window and yelled to the individual to approach the car. He then ordered the defendant to get out of the automobile and tell the man to get into the automobile. The defendant stated that he complied with Cobb's order and pointed at the automobile as he told Posedel to get in. The defendant denied having a gun in his hand, but stated he had in his hand a pair of dark gloves with orange or brownish fur. As Posedel approached the car, defendant noted that Cobb had his hand on the gun. Cobb opened the rear passenger door and told Posedel to get in. As he got back in the car, defendant looked and saw that Cobb was pointing the gun at Mr.

Posedel's ribs. According to defendant, Cobb then instructed him to drive, so he pulled away slowly. Shortly thereafter, Cobb told Posedel to get out of the automobile and not to run. Cobb then wanted to visit a friend just down the street, but defendant asked him if he could take Miss Hicks home first. Defendant explained that at the time, he felt Posedel would report the robbery to the police, and he did not want Miss Hicks to get into any trouble. After Miss Hicks was dropped off, Cobb moved to the front seat. After driving around for a while, the defendant observed a police car make a U-turn and come up behind the automobile he was driving. Defendant stated that he pulled over immediately because he knew he was going to be stopped. The police officer asked defendant to exit the car, and she proceeded to frisk him. As she was frisking Cobb, he ran from the scene.

On cross-examination, defendant denied making any statement to Officer Hendley. Defendant acknowledged that Cobb never pointed the gun directly at him, but he stated that when Cobb told him to get out of the car, he had his hand on the gun. He also admitted that Cobb had not threatened him with harm. On redirect examination, defendant again asserted that he was afraid that Cobb was going to harm him and his girlfriend, Miss Hicks, on the night of the incident.

On rebuttal, the State called Officer Lou Moore of the Waukegan police department. Officer Moore testified that on February 12, 1987, he had a conversation with Rolanda Hicks in which she stated that the defendant pointed a gun at Posedel and told him to get into the automobile.

At the conference on jury instructions, defendant tendered a compulsion defense instruction. The trial court refused to give the instruction on the basis that there was nothing in the record to show that the defendant reasonably believed death or great bodily harm would ensue if he did not perform the criminal conduct.

In his motion for a directed verdict, defendant again brought up the compulsion defense and argued that since the State had not offered any evidence to refute the defendant's claim of compulsion, the affirmative defense of compulsion was uncontroverted, and the trial court was required to direct the verdict for the defendant. While agreeing with the defendant's reasoning, the trial court refused to direct the verdict for the defendant, since the trial court was of the opinion that the record did not contain any facts showing compulsion.

The jury returned a verdict, finding the defendant guilty of armed robbery, robbery, and theft. Defendant was sentenced to 30 years' imprisonment on the charge of armed robbery. This appeal followed.

■ Defendant contends, first, that he was denied his constitu-

tional right to counsel when the trial court denied defendant's motion for continuance.

In *People v. Clayborne* (1977), 47 Ill. App. 3d 202, 204-05, the court stated as follows:

> "A trial court's refusal to grant a motion for continuance will ordinarily not be disturbed on appeal without some showing of a clear abuse of discretion. [Citations.] A defendant is constitutionally entitled to counsel of his own choosing, if the exercise of that right does not thwart the administration of justice by inordinately delaying the trial. [Citations.]
>
> The granting of a continuance to permit preparation for a case, or for the substitution of counsel, necessarily depends upon the particular facts and circumstances surrounding the request, and is a matter resting within the sound judicial discretion of the trial court. [Citations.] A conviction will be reversed when it appears that the refusal of additional time in some manner embarrassed the accused, impeded the preparation of his defense or prejudiced his rights."

While the defendant relies on *Clayborne* as authority for his position on this issue, we find that case factually distinguishable from the case at bar. In that case, a petition to revoke Clayborne's probation had been set for hearing on August 27. Clayborne was represented by the public defender on the revocation petition. The day before, Clayborne was indicted on the charges which formed the basis of the petition to revoke probation. Clayborne asked for and received a continuance to retain private counsel to represent him. The next day, the public defender asked for a continuation of the revocation hearing on the ground that Clayborne wished to have the same attorney representing him at both the revocation hearing and the trial on the underlying offenses. The trial court denied the continuance, and following a hearing, revoked Clayborne's probation and sentenced him to the penitentiary.

In reversing and remanding for a new revocation hearing, the reviewing court determined that, given the fact that Clayborne was facing two different proceedings, the revocation hearing and the trial on the underlying offenses, each of which required a different standard of proof, there was the possibility that with different counsel representing him on each, one attorney might elect a strategy in one case that would unknowingly conflict with the strategy adopted by the other attorney. Therefore, the court held that it was reversible error to force a defendant into an early probation revocation hearing by denying defendant a continuance to secure counsel of his own choosing.

47 Ill. App. 3d at 205.

The case before us does not involve a revocation proceeding complicated by a trial on the charges forming the basis of the revocation petition. There is only one standard of proof involved in this case. We note that defendant in this case was charged with the instant offenses on February 23, 1987. The case came on for trial on April 6, 1987, although it appeared initially that defendant was going to enter a negotiated plea. The appearance of defendant's privately retained counsel, Mr. Dixon, was accepted, albeit somewhat reluctantly, by the trial court. Although initially the trial court denied defendant's request for a continuance, the trial court eventually relented and the matter was continued for trial to April 20, 1987. No objection to that date was made by the defendant or his counsel. We also note, in passing, that defendant was free on bond, subject to a curfew, prior to his conviction.

On April 20, 1987, defendant's counsel again requested a continuance based upon the fact that he had only been retained on April 5 and that he had attempted to interview Bernard Cobb only to find that he had been transferred to Joliet, Illinois. After it was determined that the State was uncertain as to whether Cobb would be called as a witness, the trial court denied the motion. When the case was called an hour later, defense counsel renewed his motion for continuance on the basis that the discovery he had received from the State was incomplete. The trial court instructed the State to supply the defendant with the missing discovery prior to the start of the trial, which was then scheduled for 1:30 p.m. that day.

Prior to the commencement of the trial, defense counsel informed the State that he was raising a compulsion defense on behalf of the defendant. When the trial court inquired as to the notice given to the State of the defendant's intent to raise such an affirmative defense, defense counsel renewed the motion for continuance. The trial court did permit the defendant to raise the affirmative defense of compulsion. Further, defense counsel was also permitted to conduct a hearing to suppress statements of the defendant during the trial. These facts present a vastly different situation than the one in *People v. Clayborne.*

In *People v. Tyler* (1984), 128 Ill. App. 3d 1080, 1097, the court stated:

> "Before a reviewing court finds that a trial court abused its discretion in denying a continuance, there must be a showing that the defendant suffered actual prejudice due to the attorney's lack of preparation. [Citation.] Where the record shows

that the trial attorney appeared fully prepared and conducted representation of the accused with diligence and skill, courts are reluctant to find prejudice to the movant's rights from denial of the motion. [Citation.] A court's denial of a request for additional time will not be subject to reversal absent a showing of prejudice thereby."

We agree with the State that despite the denial of a continuance on April 20, the record in this case demonstrates that defendant was adequately represented at trial. Defense counsel raised an affirmative defense, conducted a hearing to suppress defendant's statements, cross-examined State's witnesses, and presented testimony on defendant's behalf. (See *People v. Hayes* (1972), 52 Ill. 2d 170.) That defense counsel's efforts on defendant's behalf did not succeed does not require us to conclude that counsel had insufficient time to prepare, particularly in light of the fact he failed to object at the time the April 20 trial date was set. While defendant charges that he was prejudiced by defense counsel's inability to interview Bernard Cobb, Cobb neither testified against the defendant, nor has defendant shown, other than by speculation and conjecture, what facts defense counsel could have gleaned from that interview that would have changed the outcome of defendant's trial.

■ Finally, defendant argues that the trial court's clear animosity towards defense counsel affected its ability to properly exercise its discretion in ruling on whether or not to grant the continuance requested by the defendant. We would agree with the defendant that at certain times the record in this case reflects a certain "frostiness" between defense counsel and the trial court in their exchanges. This apparently stems from events preceding trial involving collisions between the trial court's desire to control the flow of cases in his courtroom and defense counsel's goal to advocate on behalf of his client. The record reflects that both goals were met and not at the defendant's expense. The record does not reflect that any displeasure with defense counsel was visited upon the defendant. In fact, the trial court informed defense counsel that, "[T]his young man [the defendant] is going to receive his full day in court with all the safeguards of all the rights that is [*sic*] guaranteed him."

We conclude, therefore, that the defendant was not deprived of his right to counsel by the denial of his motion for continuance.

Next, the defendant contends that the trial court erred in refusing to give the compulsion defense instruction tendered by the defendant.

■■ ■ The defense of compulsion is governed by statute. A defendant may not be found guilty of a crime if he assisted in the

commission of the crime "under the compulsion of threat or menace of the imminent infliction of death or great bodily harm, if he reasonably believes death or great bodily harm will be inflicted upon him if he does not perform such conduct." (Ill. Rev. Stat. 1987, ch. 38, par. 7—11.) In Illinois, compulsion is an affirmative defense. When the compulsion defense has been raised by the defendant and some evidence introduced to support it, the State has the burden of overcoming this evidence by proof beyond a reasonable doubt. *People v. Colone* (1978), 56 Ill. App. 3d 1018, 1021.

■ A defendant is entitled to the benefit of any defense shown by the entire evidence, even if the facts on which such defense is based are inconsistent with the defendant's own testimony, and very slight evidence upon a given theory of a case will justify the giving of an instruction. (*People v. Bratcher* (1976), 63 Ill. 2d 534, 540.) In *People v. Larry* (1986), 144 Ill. App. 3d 669, this court addressed the question of whether or not an affirmative defense instruction ought to have been given, stating as follows:

> "The quantum of proof necessary to raise an affirmative defense is evidence sufficient to raise a reasonable doubt as to defendant's guilt. [Citations.] A criminal defendant is entitled to have a jury instructed on any legally recognized affirmative defense theory on which he has presented 'some evidence.' [Citations.] There must, however, be enough evidence to require that the issue be submitted to the jury. Stated otherwise, unless the evidence before the trial court is so clear and convincing as to permit the court to find as a matter of law that there is no affirmative defense, the factual issue—that is, whether the defendant should be relieved of criminal liability by reason of his affirmative defense—must be determined by the jury with proper instruction as to the law applicable. [Citations.] The issue, therefore, before the trial court below was whether the evidence before it concerning the defendant's intoxication was so clear and convincing that it could be said as a matter of law there was no affirmative defense of involuntary intoxication." 144 Ill. App. 3d at 676.

■ In refusing to give defendant's tendered instruction on compulsion, the trial court determined that the record revealed no facts showing that the defendant was compelled to commit the criminal acts of which he was convicted. The State maintains, and we agree, that the testimony of both the defendant and Miss Hicks, if believed, merely established that they were afraid of Cobb because he was in possession of a gun and was high on drugs or alcohol or both. Neither

defendant nor Miss Hicks testified that he or she was threatened with death or great bodily harm if defendant did not follow Cobb's instructions. Any fear of Cobb on defendant's part appeared to come from Cobb's mere possession of the gun, not because he actually threatened defendant or Miss Hicks with the gun. Given that fact, this case is distinguishable from *People v. Pegram* (1988), 124 Ill. 2d 166, relied upon by defendant. In that case, our supreme court held that the requirement of "some evidence" in order to instruct on the affirmative defense of compulsion was satisfied by the defendant's testimony that "he was forced, at gun point, to lead the robbers to Mackin, open the freezer door, lie on the floor, and then lead the robbers to Mackin's car." *Pegram*, 124 Ill. 2d at 173.

We are of the opinion that the trial court correctly ruled as a matter of law that there is no affirmative defense of compulsion in this case.

Finally, the defendant contends that his 30-year sentence of imprisonment for armed robbery is excessive. He argues that the sentence is fundamentally unfair and is disparate with the sentence imposed on Bernard Cobb, his codefendant. Cobb received a sentence of 8½ years for armed robbery stemming from the same incident involving the defendant.

■■ ■ It is not the function of a reviewing court to serve as a sentencing court, and absent an abuse of discretion, a sentence will not be disturbed on review. (*People v. Jackson* (1986), 145 Ill. App. 3d 626, 646.) At the same time, however, fundamental fairness and respect for the law require that defendants similarly situated should not receive grossly disparate sentences. "Similarly situated" refers to rehabilitation or the nature and extent of participation. (145 Ill. App. 3d at 646.) However, a disparity in sentencing may be supported by a more serious criminal record or greater participation in the offense than the individual with whom defendant's conduct is compared. (145 Ill. App. 3d at 646.) In *People v. Jackson*, following a jury trial, Jackson was sentenced to an extended term of 80 years for murder, while his codefendant, who pleaded guilty, received a sentence of 30 years. Jackson and his codefendant had similar criminal histories, except that the codefendant had served time in the penitentiary, whereas Jackson had not. Jackson was 22 and the codefendant was 27 at the time of their respective sentencings. The court reduced Jackson's sentence to 30 years based on the fact that the evidence showed the codefendant was the more active participant in what the court termed a "brutal and heinous crime." 145 Ill. App. 3d 647.

■ The State argues that, because the record here does not disclose the factors relied on by the trial court in sentencing Cobb, this

court should reject defendant's argument as to the disparity in sentencing. The mere fact that one defendant receives a substantially longer sentence than another does not, by itself, establish a violation of fundamental fairness. (*People v. Kline* (1982), 92 Ill. 2d 490, 508.) A disparity in sentences will not be disturbed where it is warranted by differences in the nature and extent of the defendant's participation in the offense, and their respective criminal records. (92 Ill. 2d at 508.) It is the defendant's burden to produce a record from which a rational comparison of sentences can be made, and when defendant has failed to do so, the court cannot determine whether the trial court abused its discretion in imposing the sentence complained of. 92 Ill. 2d at 509.

The defendant has furnished this court with a copy of the transcript of Bernard Cobb's sentencing hearing. Cobb was sentenced prior to defendant's trial and by the same judge who sentenced the defendant. The transcript reveals that Cobb had entered into a negotiated plea of guilty to the armed robbery of Dale Posedel in exchange for a sentence of 8½ years' imprisonment, and he agreed to testify against the defendant, if called to do so. Cobb was 18 at the time of his sentencing. He was also on probation for burglary at the time of the Posedel armed robbery, which was revoked, and he was sentenced to seven years' imprisonment to be served concurrently with his sentence for armed robbery. Cobb waived his right to a presentence report, so the complete status of his record is unknown.

The record here reveals that both defendant and Cobb were young men at the time of the offense; defendant was 20 and Cobb was 18 at the time of their respective sentencings. Cobb was on probation for burglary at the time of the instant offense. The defendant had no prior conviction, but his presentence report indicated that there were several warrants outstanding for his arrest, one of which was for robbery. As for the relative participation of each in the armed robbery of Dale Posedel, the defendant argues that at his sentencing hearing, Cobb stated that he did not see a gun in defendant's hand. However, Posedel testified that defendant had the gun and threatened him with it if he didn't follow defendant's orders. According to Posedel, Cobb took the items from Posedel's pockets.

■■ It is proper for a trial court to grant leniency in sentencing a defendant who by his plea ensured prompt and certain application of correctional measures to him, acknowledged his guilt, showed a willingness to assume responsibility for his conduct, and cooperated in the successful prosecution of other offenders. (*People v. Massarella* (1979), 80 Ill. App. 3d 552, 573.) Taking into consideration that al-

though his was not a passive role in the commission of the offense against Posedel, and he had a prior conviction, we cannot say that the facts that Cobb was not armed, pleaded guilty to the offense, and agreed to testify against the defendant, if necessary, were not sufficient to justify the imposition of a lesser sentence on him than on the defendant.

Nonetheless, while we agree that the trial court committed no error in imposing a different sentence on the defendant than the one imposed on Cobb, we are of the opinion that a 22-year difference is too great and that defendant's sentence should be reduced.

In *People v. Gibbs* (1977), 49 Ill. App. 3d 644, the court in reducing a 19-year-old defendant's 50- to 100-year sentence for murder to not less than 15 years and not more than 45 years, stated as follows:

> "This State's fundamental law requires that 'All penalties shall be determined both according to the seriousness of the offense and *with the objective of restoring the offender to useful citizenship.*' (Emphasis added.) [Citation.] Usually the cases have treated this mandate as calling for a balancing of the retributive and rehabilitative purposes of punishment. Looked at from this perspective, one might justify a sentence which has been given merely by determining whether or not the trial judge considered the possibility of rehabilitation as compared to a proper retributive sanction based upon the seriousness of the offense and the character of the defendant and his conduct. If this be the appropriate analysis any record which demonstrates an acknowledgement of the rehabilitative purpose could be affirmed providing the sentence was within the statutory limits.
>
> The constitutional mandate, however, requires more. Not only must the judge consider the rehabilitative or restorative factor, he must also act on it as an objective of his sentence. Some degree of discretion is permitted *** but the judge may not resign to total retribution one who has a chance of future restoration to useful citizenship in the free society." 49 Ill. App. 3d at 648.

The offense of armed robbery carries with it a mandatory minimum penalty of 6 years' imprisonment and a maximum penalty of 30 years. (Ill. Rev. Stat. 1987, ch. 38, par. 1005—8—1(a)(3).) The trial court imposed the maximum penalty, citing the facts that defendant had lied to him at the time of his bond hearing by stating that he had not been in trouble before, when, in fact, there were outstanding warrants for his arrest; that he used a gun to commit the offense; and he appeared to have no remorse, despite defendant's statement at the

 

sentencing hearing that he was ready to be rehabilitated.

Defendant's conviction of armed robbery presupposes some kind of weapon was used in the commission of the offense. We note also that despite the outstanding warrants, defendant has never previously been convicted of a crime. Moreover, "[a] defendant is not required to admit his guilt and failure to do so should not result in an enhanced sentence." *People v. Sherman* (1977), 52 Ill. App. 3d 857, 859.

██ While the trial court's desire to discourage others from criminal activity by the imposition of lengthy sentences is nobly motivated, given the defendant's youth, lack of a prior record, and the fact that the victim was uninjured in this case, we reduce the defendant's sentence of 30 years' imprisonment to 12 years' imprisonment pursuant to the authority given this court under Supreme Court Rule 615(b)(4). 107 Ill. 2d R. 615(b)(4).

The defendant's judgment of conviction is affirmed, but the sentence imposed thereon is modified as specified.

Judgment affirmed; sentence modified.

NASH and INGLIS, JJ., concur.