THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v.
SERVANDO GARCIA, Defendant-Appellant.

Second District   No. 2—89—0915

Opinion filed July 21, 1992.

G. Joseph Weller and Thomas A. Lilien, both of State Appellate Defender's Office, of Elgin, and Michael J. Pelletier and Anne E. Meyer, both of State Appellate Defender's Office, of Chicago, for appellant.

Gary V. Johnson, State's Attorney, of Geneva (William L. Browers and Lawrence M. Bauer, both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE DUNN delivered the opinion of the court:

Defendant, Servando Garcia, was convicted of murder (Ill. Rev. Stat. 1991, ch. 38, par. 9—1) and was sentenced to a 45-year term of imprisonment. On appeal, defendant contends that he is entitled to a new trial for the following reasons: (1) the prosecutor made misstatements during closing argument about the law of accountability; (2) the prosecutor made improper remarks during trial and closing argument in which he vouched for the credibility of the State's key witness; (3) the trial judge failed to admonish most of the jurors that they were not to discuss the case with one another prior to their deliberations; (4) the trial judge failed to admonish the jurors that they were not to form an opinion regarding the defendant's guilt or innocence prior to the conclusion of the trial; (5) the trial judge failed to make an adequate inquiry after discovering that several jurors had discussed the case with one another during the trial; and (6) defendant received ineffective assistance of counsel. Defendant also contends that his sentence was excessive when compared with the sentences imposed upon the other two alleged perpetrators.

The State's primary witness, Artemio Garcilazo, testified as follows. On the morning of January 7, 1989, he saw defendant and a man named Pedro Reyes standing by the railroad tracks near an abandoned building formerly used as a switch house by a railroad. The three men went inside the switch house and saw Juan Hernandez and Teodoro Ovideo inside. The victim, Robert Snow, arrived at the switch house a little later, after which Hernandez and Ovideo left.

Garcilazo, Reyes, Snow, and defendant began to share some vodka and beer. An argument ensued between defendant and Snow. Garcilazo did not understand what Snow and defendant were saying because they were arguing in English. Defendant and Snow then began to fight. Garcilazo did not see who struck the first blow, although he did see defendant hit Snow in the chest two or three times. Defendant then told Garcilazo that it was his turn, and Garcilazo hit Snow in the chest a few times. Reyes did likewise after defendant stated that it was his turn.

Defendant then attempted to strangle Snow with a cord. He also attempted to put Snow's face into some burning coals that were in-

side the switch house. Snow was able to prevent him from doing so, however.

Snow then got up. Defendant pushed him into an electric motor that was inside the switch house. Snow fell backwards and hit his head against a wall. When he got up, defendant hit him in the head with a board. Snow fell to the ground and did not get up again.

Defendant then asked Garcilazo for a knife. Garcilazo said that he did not have a knife but did have a screwdriver. Defendant told Garcilazo to give him the screwdriver, and Garcilazo complied. Defendant then stabbed Snow in the chest two or three times with the screwdriver. He then gave the screwdriver to Reyes and told him to stab Snow. Reyes did so several times. Garcilazo then left the switch house. Garcilazo testified that, at the time of the above events, defendant and he were both "halfway" drunk.

Garcilazo was arrested for murder on January 11, 1989. On the day of his arrest, he spoke to two Aurora police officers. At first he told the officers that he was at work at the time of the killing. The officers told him that they would check his story. Garcilazo then told the officers that he had gotten into a fight with Snow because Snow had broken a bottle of vodka, and Garcilazo had contributed some of the money that had been used to purchase the vodka. Garcilazo hit Snow, and Snow fell to the ground. Defendant then grabbed a screwdriver from one of Garcilazo's pockets and began stabbing Snow. Garcilazo went outside to urinate. When he returned inside the switch house, Snow was bleeding. Garcilazo also told the officers that he got blood on his clothing by falling on Snow.

Garcilazo also testified that he spoke to Gary Johnson, the Kane County State's Attorney, on April 17, 1989, and that the version of the killing that he gave to Johnson differed from his trial testimony in several respects. Garcilazo told Johnson that the argument between defendant and Snow started over a broken bottle of vodka. Garcilazo also told Johnson that defendant had put Snow's face into a coal fire and had briefly held it in the fire.

As a result of the above meeting, Garcilazo entered into a plea agreement with the State. Under the terms of this agreement, Garcilazo would plead guilty to second-degree murder and receive a four-year sentence if he testified truthfully against defendant and Reyes. If Garcilazo lied during his testimony, the sentence would be 20 years.

Garcilazo admitted during his testimony that he had been convicted of attempted burglary and arrested for felony theft. He further admitted that he had given a false name to law enforcement officials when arrested on the latter charge so that he would be released on

bond and would not have problems relating to his probation. Garcilazo acknowledged that he had lied in the past in order to stay out of prison, including his conversations with the police on January 11, 1989, about the instant case. Garcilazo stated that his trial testimony was true, however.

Dr. Larry Blum, a forensic pathologist, testified that he conducted an autopsy upon Robert Snow's corpse. The cause of Snow's death was internal hemorrhaging from multiple stab wounds to Snow's heart and lungs, with blunt trauma to Snow's head as a contributing factor. Dr. Blum did not see any evidence of attempted ligature strangulation or any evidence that Snow had suffered burns to his face or head. Snow's blood-alcohol content was 0.404%, an extremely high level.

Acting pursuant to search warrants, the Aurora police found clothing with bloodstains in the residences of defendant, Garcilazo and Reyes. A pair of sweat pants found in defendant's apartment contained bloodstains whose composition was consistent with Snow's blood. The same was true of pants found at the residences of Garcilazo and Reyes.

Victor Ovideo, a neighbor who lived in the same apartment building as defendant, testified as follows. Defendant went to the Ovideo apartment on the afternoon of January 7, 1989. Defendant's clothes were spotted, and it appeared that he had been beaten. Defendant seemed to be intoxicated at the time. He told Ovideo that he had been involved in a fight and had been defending Ovideo's brother. Ovideo's wife, Guadalupe, was in another room at the time, but she testified that she overheard defendant saying that he had been in a fight. Victor Ovideo stated during his testimony that he saw his brother, Teodoro, on January 9, 1989, and Teodoro had a black eye. Victor Ovideo's sister was married to Pedro Reyes' son.

Defendant testified as follows. He spent most of the evening of January 6, 1989, at the abandoned switch house in Aurora where he was drinking with a man named Juan Hernandez. Defendant's wife did not want him to return home because he had been drinking, so he spent the night at a shelter for homeless people in Aurora. He woke up at about 7 o'clock in the morning on January 7 and still felt drunk.

Defendant then went to the switch house, where he saw Juan Hernandez. The two began drinking beer and vodka. Reyes, Garcilazo, and Snow went into the switch house later that morning. Hernandez left the switch house in order to try to sell a tape recorder. Hernandez told defendant to wait for him.

After Hernandez left, a fight broke out. Defendant was lying down on the ground at the time and remained there. He believed that the fight was started because Snow had broken a bottle of vodka. Garcilazo and Reyes were hitting Snow and Garcilazo was stomping on him. Garcilazo also had a screwdriver in his hand and was stabbing Snow in the chest with it.

At one point, Garcilazo hit Snow and knocked him over on top of defendant. Defendant hit Snow with an open hand in order to push him away. In so doing, he did not intend to assist Garcilazo or Reyes; he merely intended to push Snow off him. As a result, defendant ended up with a good deal of blood on his person and clothing. After defendant pushed Snow away, Snow remained on the ground, and Garcilazo and Reyes continued hitting him. Defendant got up and stood in the doorway. Reyes then touched Snow and stated that he was not dead yet. Garcilazo handed Reyes the screwdriver and told Reyes to hit Snow in the heart. Reyes took the screwdriver and stabbed Snow several times in the area of his heart.

Defendant did not try to stop Reyes and Garcilazo because he was afraid of them, and he did not have much strength because he was drunk. After Reyes stabbed Snow in the heart, defendant left the switch house. He saw Juan Hernandez, Teodoro Ovideo, and another man standing by the railroad tracks. After a few minutes, defendant and Hernandez went to a bar. Garcilazo and Reyes followed them. Defendant left after a short time and went to Victor Ovideo's apartment. He denied telling Ovideo that he had been in a fight. He stated instead that he told Ovideo that he had just seen two men kill a white man. Defendant did not go to the police because he feared reprisals from Reyes and Garcilazo.

The two Aurora police officers who interrogated defendant early in the morning on January 11, 1989, testified that he was generally cooperative in responding to their questions. They testified that defendant originally told them that he did not know why the fight started and that Snow was alive though unconscious when defendant left the switch house to find Hernandez. Defendant also originally told them that Reyes and Garcilazo left the switch house 10 or 15 minutes later and told the others that Snow was dead. After the officers asked about the blood found on defendant's clothing, defendant stated that he had seen Garcilazo and Reyes stab Snow with a screwdriver after Snow had been knocked unconscious. Defendant also told them that the fight had started because Snow had refused to contribute any money toward the purchase of beer. The version of events which

defendant gave to the officers was generally consistent with his trial testimony in other respects.

The judge who presided over the remainder of the trial was ill on the day that jury selection was conducted, and the parties agreed that a different judge could preside over the jury selection. That judge admonished the initial panel of four jurors that they should not discuss the case with anyone including the other jurors. He repeated this admonition to the other jurors but did not tell them that it applied to discussions with one another. He also failed to admonish the jurors that they were not to form any opinion as to defendant's guilt or innocence until the trial was over.

After all the evidence was presented, but before closing arguments, the State's Attorney received a phone call from two women who had overheard three jurors discussing the case at a restaurant near the courthouse that morning. The State's Attorney reported the matter to the trial judge, who met with the women and counsel for both sides in chambers.

One of the women, Charlene Chatham, a Florida attorney, stated that she was eating with a friend named Carol Wather that morning at a restaurant near the courthouse. Three men who were wearing juror identification tags on the front of their shirts came into the restaurant and sat near Chatham and Wather. Chatham said that she heard one of the jurors say that the prosecutor had blown a first-degree murder conviction. The men were also saying that the public defender was doing some aggressive things. Chatham decided that she should contact someone because she felt the jurors' conversation was improper. She stated that Wather had heard more of the conversation than she had.

The trial judge conducted an *in camera* interview with Carol Wather. Wather stated that, after the three men sat down, she heard one of them mention a Spanish name. She then heard one of them mention first-degree murder. She told Chatham that the men were talking about a murder trial. Chatham then stated that they were jurors. Wather told Chatham that she did not think the conversation that the men were engaged in was appropriate.

Wather told the trial judge that there was a good deal of conversation among the men about how Johnson was angry and Johnson had blown the case. Wather did not know if Johnson was the prosecuting attorney or the defense attorney. She stated that two of the men seemed to have their minds made up about the verdict while one seemed open-minded. She was not sure whether the two men were planning to vote guilty or not guilty. The trial judge informed counsel

that, according to Wather, two of the jurors had picked sides and that they were inclined favorably toward the defense.

Between the interviews with Chatham and Wather, the trial judge stated that he would advise the jurors that some of them had been overheard discussing the case and ask if they were still able to listen to closing arguments with an open mind. If any indicated that they were unable to do so, a mistrial would be declared. After listening to Wather, the trial judge stated that he would question only the three jurors who had engaged in the conversation at the restaurant. Defense counsel objected on the basis that such a procedure might cause these jurors to feel that they were being scrutinized and cause them to vote guilty. She suggested that the trial judge stay with the procedure he had previously intended to employ. The trial judge agreed to do so.

The trial judge then admonished the jurors. He mentioned that several had been overheard discussing the case. He stated that the jurors should not form or express any opinion about the case until they begin their deliberations and, until that point, should not discuss the case with anyone, including one another. The trial judge also stated that the jurors should listen to the closing arguments and the instructions. He asked if any of the jurors would be unable to listen to the arguments or to otherwise discharge their duties as jurors and asked them to raise their hands if they were. No one raised his or her hand.

The jury found defendant guilty. The trial judge subsequently denied defendant's post-trial motion. At defendant's sentencing hearing, Valerie Gerhardt, the director of PADS, an organization which provides shelter to the needy, testified that she had known defendant for about three years. She stated that defendant was quiet, well-mannered, patient, and cooperative. Defendant often volunteered to help others at the shelter and always conducted himself in accordance with its rules.

Helen Flores, defendant's stepdaughter from his first marriage, testified that defendant and her mother were happily married for about seven years, until her mother died as a result of an illness. She stated that defendant cared for her mother during this illness and described defendant as a kind, compassionate man. Flores testified that she and her mother's other children maintained contact with defendant after their mother's death because of their affection for him. She further testified that defendant began to drink more frequently after her mother's death and continued to do so after meeting his present wife.

The trial judge, relying largely upon the brutal nature of the killing, imposed a 45-year sentence. Later, in separate proceedings, Pedro Reyes entered a plea of guilty to first-degree murder, and Artemio Garcilazo pleaded guilty to second-degree murder. Pursuant to separate plea agreements, Reyes received a 25-year sentence, and Garcilazo was sentenced to a four-year term of imprisonment.

Defendant's initial contention on appeal is that he should receive a new trial because of alleged misstatements by the prosecutor during closing argument about the law of accountability and its applicability. Prosecutors are generally given a great degree of latitude in closing arguments, and improper remarks will not result in reversal unless they cause substantial prejudice to the defendant, considering the context of the language employed, its relationship to the evidence, and its effect upon the defendant's right to a fair trial. (*People v. Thompkins* (1988), 121 Ill. 2d 401, 445.) Stated another way, improper remarks will not justify a reversal unless they were a material factor in defendant's conviction without which the jury might have reached a different result. (*Thompkins*, 121 Ill. 2d at 445; *People v. Lyles* (1985), 106 Ill. 2d 373, 391.) Furthermore, an instruction that closing arguments are not evidence and that any statement during arguments that is not based on the evidence should be disregarded tends to cure any prejudice from improper remarks. *People v. Hrobowski* (1991), 216 Ill. App. 3d 711, 727; *People v. Thomas* (1990), 200 Ill. App. 3d 268, 275.

Under the portion of the accountability statute at issue here, a party can be held legally accountable for the conduct of another only if "before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." (Ill. Rev. Stat. 1991, ch. 38, par. 5–2(c).) It is not enough to show that the defendant's conduct facilitated the commission of the offense; the prosecution must also show that the defendant acted with the intent to facilitate the commission of the offense. *People v. Lashmett* (1984), 126 Ill. App. 3d 340, 347.

Bearing the above principles in mind, we will examine the comments challenged by defendant. The first comment is as follows:

> "And what we do know in this case is that the Defendant by his own admission did absolutely nothing to help the victim, Bobby Snow. So that leads you to the almost, almost anyhow, inalterable conclusion, inescapable conclusion that he had to have done something simply by being there because —."

Defendant's attorney then objected on the basis that the prosecutor was misstating the law of accountability. The trial judge overruled the objection.

The prosecutor then continued, stating as follows:

> "Let me repeat myself. You must come to the inescapable or at least almost inescapable conclusion that because the Defendant by his own admission did not help Bobby Snow, he must have done something to help in his demise. Nobody could just sit there. Nobody could just lay there as the Defendant stated."

Shortly before making the above comments, the prosecutor made mention of the brutal nature of the killing and the fact that it took place in a small room.

■ The above-quoted remarks contain no misstatements of the law of accountability. We do not interpret the comments as indicating that defendant's mere presence at the scene of the offense would render him accountable for the crime, which would have been a misstatement of the law. (See *People v. Evans* (1981), 87 Ill. 2d 77, 83.) Instead, the prosecutor was arguing that defendant's version of events was not credible because it was contrary to human experience that a person in a small room observing a brutal beating would merely lay there and do nothing. In closing argument, the prosecutor is entitled to comment upon the evidence and to draw any legitimate inferences from it. (*People v. Nevitt* (1990), 135 Ill. 2d 423, 451.) This is all the prosecutor was doing with respect to the above comments. We therefore find that they were proper.

Much later during his closing argument, the prosecutor quoted the accountability instruction that the trial court later gave to the jury. That instruction states:

> "A person is legally accountable for the conduct of another person when, either before or during the commission of an offense, and with the intent to promote or facilitate the commission of that offense, he knowingly solicits, aids, abets, agrees to aid, or attempts to aid the other person in the planning or commission of an offense.
>
> The word 'conduct' includes any criminal act done in furtherance of the planned and intended act."

The prosecutor then stated as follows:

> "Read that instruction over, ladies and gentleman of the jury. Read that instruction over because that instruction fits this case even if you were to believe the Defendant's own theory of the case.

According to the law, if you believe the Defendant's own theory of the case, he is guilty because he's legally responsible because he aided and abetted according to the accountability theory."

Defendant's attorney objected and contended that the above statement was inaccurate because defendant testified that he did not intend to help Garcilazo and Reyes. The trial judge then admonished the jurors that the attorneys would sometimes disagree about the content of the testimony, and it was up to the jurors to determine what the facts were and apply the law to them. The prosecutor later stated as follows:

"Did he do anything to help the victim? No. Was he in the room during the entire time *** during the murder of the victim? Yes, he was. Did he try to do anything to stop those other two from killing the victim? No, he didn't. Did he hit the victim? According to the statement that he made to the police, he might have hit the victim. According to what he said today, he hit the victim. And when he hit the victim, ladies and gentlemen of the jury, I submit to you he became accountable even— even if you believe everything that he told you and reject everything that the State's witnesses have told you."

Defendant's attorney objected on the basis that the prosecutor had left out the element of intent to promote the offense and join in with the others. The trial judge sustained this objection. The prosecutor then said:

"Read the accountability instruction. With that instruction in mind, under the Defendant's theory, he is guilty on the theory of accountability by that instruction."

■ We agree with defendant that the prosecutor's statements that defendant was guilty under an accountability theory even if his testimony was true were inaccurate. Defendant testified that he did push or hit the victim but only did so because Snow was on top of him. According to defendant's testimony, he was not trying to assist Reyes and Garcilazo; he was only attempting to push Snow off him. If defendant's testimony was true, he was not guilty under an accountability theory because he lacked the intent to promote or facilitate the commission of the offense.

We do not believe, however, that a new trial is warranted because of the improper remarks. First of all, with respect to the lengthiest and most emphatic of these remarks, the trial judge sustained a defense objection. Sustaining a defense objection to improper remarks during argument tends to cure any possible resulting prejudice. (*Peo-*

*ple v. Hrobowski* (1991), 216 Ill. App. 3d 711, 727.) While there were other similar misstatements which were not cured by the sustaining of a defense objection, there were other factors to limit the prejudice from these remarks.

The trial judge gave the jury an accountability instruction which accurately stated the applicable law, and the prosecutor read the same instruction to the jury and encouraged the jurors to read it. Thus, the jurors were made aware of the proper legal principles to be applied. The trial judge also instructed the jurors that opening and closing arguments are not evidence and that any comment during arguments that is not based upon the evidence should be disregarded. This instruction tends to cure any prejudice from misstatements about the evidence during arguments. (*Hrobowski*, 216 Ill. App. 3d at 727.) Therefore, the trial court also made the jurors aware that the prosecutor's improper remarks should be disregarded if the defendant's own testimony would not have rendered him guilty under an accountability theory. Finally, during her closing argument, defendant's attorney summarized defendant's testimony and argued that, if the jury believed it, the jury could not find him guilty under an accountability theory because defendant lacked the requisite intent. These factors, taken together, were sufficient to cure any prejudice from the improper remarks.

Defendant also argued that the prosecutor improperly vouched for Garcilazo's testimony by bringing out, while Garcilazo testified, the fact that his plea agreement required Garcilazo to present truthful testimony or face a 20-year sentence instead of a four-year sentence. For the same reason, defendant argues that it was improper for the prosecutor to state several times during *voir dire* that the State would call a witness who had participated in the crime and had entered into a plea agreement which required him to testify truthfully.

Defendant raised no objection at trial or in his post-trial motion regarding the above matters. Ordinarily, this would result in a waiver of the issue on appeal. (*People v. Enoch* (1988), 122 Ill. 2d 176, 186.) Defendant, however, contends that this issue should be reviewed under the plain-error exception to the waiver rule (134 Ill. 2d R. 615(a)). Under the plain-error doctrine, alleged trial errors which were otherwise waived will be reviewed if the evidence was closely balanced or the alleged error was so serious that it deprived the defendant of a fair trial. *People v. Priola* (1990), 203 Ill. App. 3d 401, 417.

 We agree with defendant that the evidence was closely balanced. The only two witnesses who saw the killing, defendant and Garcilazo, gave conflicting versions of what happened. Although at

trial the State placed great weight on the amount of Snow's blood found on defendant's pants, defendant's explanation as to how this occurred was plausible. The State also placed great emphasis on the Ovideos' testimony that defendant admitted on the afternoon of January 7, 1989, that he had been in a fight earlier that day. Defendant denied saying this, however, and the Ovideos, as relatives by marriage of Pedro Reyes, may have had some incentive to testify against defendant. Thus, the State's case hinged largely on Garcilazo's testimony, and there was reason to question his credibility in light of his prior felony conviction, his admitted prior lying in order to stay out of jail, and the conflicting versions of the killing that he gave to the police, the State's Attorney, and at trial. For these reasons, we conclude that the trial evidence was closely balanced, and we will apply the plain-error doctrine.

It is improper for a prosecutor to vouch for the credibility of a witness. (*People v. Emerson* (1987), 122 Ill. 2d 411, 434.) This is primarily because allowing such a practice would give the State an unfair advantage by allowing it to place the integrity of the State's Attorney's office behind the credibility of its witnesses. *People v. Valdery* (1978), 65 Ill. App. 3d 375, 378.

There are no reported Illinois cases concerning whether a prosecutor has improperly vouched for the credibility of a witness by causing to be revealed the fact that a plea agreement requires the witness to provide truthful testimony. The United States Court of Appeals for the Seventh Circuit has concluded that this does not constitute improper vouching for the credibility of a witness unless the prosecution suggests that it possesses information that the jury does not have with regard to the veracity of the witness. (*United States v. Mealy* (7th Cir. 1988), 851 F.2d 890, 900; *United States v. Craig* (7th Cir. 1978), 573 F.2d 513, 519.) The court stated in *Craig* that allowing all evidence concerning the terms of a plea agreement to be presented aids the jury in its task of evaluating the credibility of witnesses. *Craig*, 573 F.2d at 519.

We agree with the seventh circuit's conclusion. A prosecutor who causes the promise of a witness to provide truthful testimony pursuant to a plea agreement to be revealed has only revealed that the witness agreed to tell the truth; the prosecutor has not expressed a personal opinion as to whether the witness has actually complied with the agreement by telling the truth. Therefore, we conclude that bringing forth such an agreement does not constitute improper vouching for the credibility of the witness.

Defendant further contends, however, that, while questioning Garcilazo, the prosecutor suggested that he had information that the jury lacked that Garcilazo was telling the truth. Defendant complains of the following exchange between the prosecutor and Garcilazo:

"Q. Did I tell you prior to your testifying today what would happen if I caught you lying?

A. Yes.

* * *

Q. [To translator] What—ask him if he recalls what I told him would happen to our agreement if I caught him lying today.

MR. GARCILAZO: Yes.

Q. What did I tell you would happen?

A. That if I lied, you would give me 20 years."

■ Defendant argues that the above passage insinuated that the State's Attorney knew the true version of the killing and that Garcilazo had testified to that version. We disagree. The above passage states only that, under the agreement, Garcilazo would receive a 20-year sentence if the State's Attorney caught him lying. It provides no indication that the State's Attorney had information unknown to the jurors indicating that Garcilazo had been truthful. We therefore reject defendant's contention.

Defendant also contends that he was denied his sixth amendment right to an impartial jury because: (1) the trial judge only admonished four of the jurors not to discuss the case with one another until their deliberations began; (2) the trial judge did not admonish the jurors to refrain from forming opinions until their deliberations commenced; and (3) the trial judge failed to make adequate inquiries of the jurors after discovering that three jurors had discussed the case with one another and two of them seemed to have made up their minds. Once again, defendant raised no objection to these matters at trial. However, in light of our prior finding that the evidence was closely balanced, we will review this issue under the plain-error doctrine.

In support of the above contention, defendant relies largely upon two Federal cases, *Winebrenner v. United States* (8th Cir. 1945), 147 F.2d 322, and *United States v. Williams* (8th Cir. 1980), 635 F.2d 744. In *Winebrenner*, the trial judge admonished the jurors during the first day of a seven-week trial that, while they were not allowed to discuss the case with others, they could discuss it among themselves. Defense counsel objected to this admonishment. The next day, the trial judge told the jurors that they could discuss the case with one another as long as they did not formulate fixed opinions about the

defendant's guilt. (*Winebrenner*, 147 F.2d at 326-27.) In reversing the defendant's conviction and ordering a new trial, the court noted that the defendant had a right to be heard by an impartial jury and stated that a danger existed that some of the jurors would have closed minds by the time defendant's evidence was presented. 147 F.2d at 328-29.

The case at bar is distinguishable from *Winebrenner*, in which the trial judge informed the jurors that they could discuss the case with one another prior to deliberations. The instant case, by contrast, involves a failure to admonish adequately rather than an erroneous admonition. In two prior Illinois cases involving contentions that alleged failures to admonish jurors adequately about certain matters deprived the defendants of trials before fair and impartial juries, the courts concluded that a showing of actual prejudice was required in order to justify a new trial. (*People v. Bean* (1990), 137 Ill. 2d 65, 113; *People v. Diaz* (1988), 169 Ill. App. 3d 66, 69.) In *Diaz*, defendant alleged a failure of the trial court to admonish the jurors not to discuss the case with anyone and to avoid exposure to media reports. (*Diaz*, 169 Ill. App. 3d at 69.) The defendant in *Bean* argued that the trial court had erred by failing to admonish the jurors to avoid media reports about the case at the end of one of the days of a lengthy trial during which the jury did receive this admonition a number of times. *Bean*, 137 Ill. 2d at 113.

In cases from other jurisdictions involving a failure to admonish jurors to avoid discussing the case among themselves or with others, courts have generally likewise required a showing of prejudice. (See, e.g., *United States v. Carter* (10th Cir. 1970), 430 F.2d 1278, 1279; *People v. Campbell* (1976), 63 Cal. App. 3d 599, 609, 133 Cal. Rptr. 815, 820; *People v. McIntosh* (1967), 6 Mich. App. 62, 70-71, 148 N.W.2d 220, 223.) The only contrary case we have found is *United States v. Williams* (8th Cir. 1980), 635 F.2d 744, cited by defendant. In *Williams*, the case was submitted to the jury following a one-day trial. The trial court failed to admonish the jurors to avoid discussing the case with anyone and to avoid exposure to media reports about the case. The court reversed defendant's conviction and ordered a new trial, concluding that no showing of prejudice was necessary. 635 F.2d at 746.

■ The courts in *Bean* and *Diaz* rejected the above holding from *Williams*. (*Bean*, 137 Ill. 2d at 114; *Diaz*, 169 Ill. App. 3d at 69.) In light of these authorities, we conclude that a new trial is warranted only if defendant establishes that actual prejudice resulted from the trial court's failure to admonish the jurors properly.

The record, of course, reveals that several jurors did engage in a discussion about the case prior to their deliberations and that two seemed to have made up their minds about the case. According to Carol Wather, the other juror seemed open-minded. Wather did not know whether the two jurors had decided to vote guilty or not guilty, but she did state that the men kept saying that Johnson had blown the case. The prosecutor's name was Gary Johnson. Furthermore, the other witness who overheard the conversation, Charlene Chatham, overheard one of the men saying that the prosecutor had blown a first-degree murder conviction. Thus, the evidence tends to show that the men were going to vote not guilty. Defendant is therefore unable to establish any prejudice from the trial court's failure to admonish the jurors adequately to avoid discussing the case with one another and to avoid reaching any opinion as to defendant's guilt or innocence prior to deliberations.

Defendant further argues that the trial court's inquiry of the jurors concerning the alleged conversation and its possible prejudicial effect was inadequate. In *People v. Miller* (1983), 120 Ill. App. 3d 495, a newspaper article about the case was found in the possession of one of the jurors. The trial court, at the request of defense counsel, conducted no inquiry into the matter at the time. Defense counsel never raised the issue again. On appeal, this court agreed to review the issue under the plain-error doctrine, but rejected the contention on the basis that a defendant "may not ask the court to proceed in a given manner and then assign as error in a court of review the ruling or action which he procured." *Miller*, 120 Ill. App. 3d at 501.

In the case at bar, when the trial judge suggested questioning the three jurors who had engaged in the conversation, defendant's attorney asked him to refrain from doing this and instead requested the procedure that the trial court subsequently undertook. Although, as in *Miller*, we are reviewing this issue under the plain-error doctrine, we conclude that defendant cannot challenge the trial court's inquiry when he requested this type of inquiry.

Defendant argues that this result is unfair because the trial court erroneously informed counsel, after interviewing Carol Wather, that Wather had stated that the jurors were inclined to vote for acquittal when Wather stated that she did not know how the two jurors who had made up their minds were inclined to vote. Since, as we have indicated, Wather stated that the jurors were saying that Johnson had blown the case, it would appear that they were, in fact, inclined to vote for an acquittal.

Defendant next contends that his trial attorney provided ineffective assistance of counsel in several respects. The first of these, according to defendant, occurred when the prosecutor filed a motion *in limine* requesting that the defense be barred from inquiring about the fact that he had previously represented Artemio Garcilazo at a bond hearing on a theft charge. The prosecutor advised the court that he had just realized that Garcilazo had previously been a client.

In order to establish a claim for the ineffective assistance of counsel, the defendant must show that his or her attorney's performance "fell below an objective standard of reasonableness" (*Strickland v. Washington* (1984), 466 U.S. 668, 688, 80 L. Ed. 2d 674, 693, 104 S. Ct. 2052, 2064) and a reasonable probability exists that the result would have been different were it not for the attorney's errors (*Strickland*, 466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068). A reasonable probability is "a probability sufficient to undermine confidence in the outcome." (466 U.S. at 694, 80 L. Ed. 2d at 698, 104 S. Ct. at 2068.) It is not sufficient to show that a strategic decision of counsel may have been erroneous or unsuccessful. (*People v. Kubat* (1983), 94 Ill. 2d 437, 486.) An ineffective assistance claim may be resolved solely on the basis that the defendant suffered no prejudice as a result of counsel's alleged errors. *People v. Johnson* (1989), 128 Ill. 2d 253, 271.

With regard to his initial ineffective assistance contention, defendant points out that a sister jurisdiction has determined that, if the prosecuting attorney previously represented a State witness who participated in the offense, that relationship is relevant for impeachment purposes. (*Walker v. State* (Ind. App. 1980), 401 N.E.2d 795, 796.) Even if we assume that this information was relevant for the purpose of impeaching Garcilazo, we do not believe that defense counsel's failure to challenge the motion *in limine* constituted ineffective assistance. There were far more significant factors reflecting adversely upon Garcilazo's credibility including his prior conviction for attempted burglary, his use of a false name when arrested for theft, and the conflicting versions of the killing that he gave to the police, the State's Attorney, and at trial. It would have been reasonable for defense counsel to decide that presenting the jury with information about Johnson's prior representation of Garcilazo would have drawn the jury's attention away from the above factors and toward a much less significant one. Further, it is highly unlikely that presenting this information would have changed the result at trial. We therefore reject this ineffective assistance claim.

■■ Defendant also contends that his attorney's failure to object to the trial court's failure to admonish the jurors to avoid discussing the case with one another and to refrain from reaching an opinion concerning his guilt or innocence prior to deliberations constituted ineffective assistance, as did counsel's request that the trial court limit its inquiry into the jurors' improper conversation. We have already concluded that defendant did not establish prejudice from the former of these alleged errors; therefore, this claim must be rejected. With respect to the latter claim, counsel had information that the jurors were inclined to vote for acquittal. From a strategic viewpoint, it makes sense that counsel would have sought to limit the inquiry into the improper conversation because it would have appeared that a mistrial would benefit the prosecution. Counsel's actions in this regard did not constitute ineffective assistance.

■■ Defendant also contends that his attorney's failure to object to the prosecutor's comments and questions which brought out the fact that Garcilazo's plea agreement required him to provide truthful testimony. Because we have concluded that it was proper to bring this fact to the jury's attention, defendant was not prejudiced by this alleged error. We reject each of defendant's claims of ineffective assistance of counsel.

■■ According to defendant, even if no single error in this case justifies reversal of his conviction and a new trial, the cumulative effect of the errors does. (See, *e.g., People v. Escobar* (1979), 77 Ill. App. 3d 169, 177.) According to our prior analysis, the only errors in this case were the prosecutor's misstatements during closing argument and the trial judge's failure to admonish jurors in certain respects. We concluded, however, that any potential prejudice from the former problem was cured by certain instructions which were given to the jury and as a result of other factors. We also concluded that defendant made no showing of prejudice as a result of the latter problem and that the evidence tends to show that the two jurors who expressed opinions about the case prior to deliberations were favorably inclined toward defense. In light of the above, defendant was not prejudiced by the cumulative effect of these errors, and his argument must be rejected.

Defendant's final contention is that his 45-year sentence was disproportionate when compared to the 25-year sentenced imposed upon Pedro Reyes and the four-year sentence imposed upon Garcilazo. A trial court's sentencing decisions are entitled to great deference and weight. (*People v. Streit* (1991), 142 Ill. 2d 13, 18.) A sentence will be

altered upon review only if the trial court abused its discretion in imposing it. *Streit*, 142 Ill. 2d at 19.

Reyes and Garcilazo both entered pleas of guilty in exchange for the sentences that were imposed. A sentence entered after a guilty plea does not provide a valid basis of comparison to a sentence imposed after a trial. (*People v. Katsigiannis* (1988), 171 Ill. App. 3d 1090, 1103; *People v. Centanni* (1987), 164 Ill. App. 3d 480, 494; *People v. Abrego* (1986), 142 Ill. App. 3d 973, 985.) The trial court may properly grant leniency to a defendant who, through his plea, has ensured prompt application of correctional measures to him or her, acknowledged his or her guilt, demonstrated a willingness to accept responsibility for his or her conduct, and cooperated in the successful prosecution of others. *People v. Milton* (1989), 182 Ill. App. 3d 1082, 1095.

In *Milton*, the defendant received the maximum sentence of 30 years for armed robbery following his trial while a similarly situated codefendant who pleaded guilty received a sentence of 8½ years. This court held that, under the circumstances of that case, the 21½-year disparity was too great, and we reduced the sentence to 12 years. (*Milton*, 182 Ill. App. 3d at 1095-96.) Among those circumstances were defendant's youthful age of 20, his lack of a prior record, the fact that the victim was not injured, and the trial court's reliance upon dubious factors. 182 Ill. App. 3d at 1095-96.

In light of the above, the imposition of a maximum sentence in *Milton* appears to have been excessive regardless of any comparison with the codefendant's sentence. The same is not true in the case at bar in light of the exceedingly brutal nature of the murder of Robert Snow. We do not believe that *Milton* modifies the general rule that a sentence imposed after a guilty plea does not form a valid basis of comparison with respect to a sentence imposed after a trial. We adhere to that rule and conclude that the 45-year sentence imposed by the trial court was not an abuse of discretion.

For these reasons, the judgment of the circuit court of Kane County is affirmed.

Affirmed.

INGLIS, P.J., and BOWMAN, J., concur.