NOTICE
Decision filed 12/03/19. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

2019 IL App (5th) 160124-U

NO. 5-16-0124

IN THE

NOTICE
This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT
_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Jackson County. |
| | ) | |
| v. | ) | No. 14-CF-522 |
| | ) | |
| TERRANCE ALLEN VINSON, | ) | Honorable |
| | ) | William G. Schwartz, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

PRESIDING JUSTICE WELCH delivered the judgment of the court.
Justices Moore and Overstreet concurred in the judgment.

**ORDER**

¶ 1    *Held*: The defendant's conviction for home invasion with a firearm is affirmed where he was not denied effective assistance of counsel and where the trial court conducted an adequate inquiry in response to his *pro se* posttrial allegations of ineffective assistance of counsel. Where the defendant's sentence was imposed in violation of *Apprendi v. New Jersey*, 530 U.S. 466 (2000), and section 111-3(c-5) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(c-5) (West 2014)), the sentence is vacated, and the case is remanded for resentencing. Upon resentencing, the court shall determine whether the defendant is entitled to credit against any fines imposed upon him in a manner consistent with this order.

¶ 2    This is a direct appeal from the circuit court of Jackson County. The defendant, Terrance Allen Vinson, was convicted of home invasion with a firearm. On March 21, 2016, he was sentenced to an enhanced sentence of 65 years' imprisonment followed by 3

1

years of mandatory supervised release (MSR).  The defendant raises four points on appeal: (1) that he was denied effective assistance of counsel, (2) that the trial court erred by failing to conduct an inquiry into his allegations that his trial and posttrial counsel were ineffective, (3) that the court committed plain error by improperly enhancing his sentence based on the age of a victim, and (4) that the mittimus must be corrected.  For the reasons that follow, we affirm in part, vacate in part, and remand for a new sentencing hearing.

¶ 3                                     I. BACKGROUND

¶ 4     On December 12, 2014, the defendant was charged by information with one count of home invasion (720 ILCS 5/19-6(a)(3) (West 2014)).[1]  It was alleged that the defendant, along with Melvin L. Sanford and Elijah J. Mosley, "without authority entered the dwelling place of Larry and BethAnn Clites *** and remained therein when they had reason to know that one or [more] persons were present therein and while armed with a firearm used force or threatened imminent use of force on persons within the dwelling place."  The information further alleged that the State would be seeking a mandatory 15-year sentencing enhancement based on the fact that the offense was committed while the men were armed with firearms (*id*. § 19-6(c)).  Mosley's case was severed before trial; Sanford and the defendant were tried together.

¶ 5     Each accused was appointed his own attorney, with Celeste Hanlin being appointed to represent the defendant.  On August 12, 2015, Hanlin moved to withdraw as the

---

[1]The defendant was also charged and convicted of one count of armed robbery.  However, that conviction was subsequently vacated by the trial court in accordance with the one-act, one-crime doctrine.  The armed robbery charge is not at issue in this appeal and will not be discussed any further.

defendant's counsel, stating that the defendant had written a letter to the trial court complaining about her performance. The defendant's letter, which was attached to the motion, complained that he and Hanlin were having a serious difference of opinion as to what witnesses should be called at trial. The letter indicated that the defendant believed that testimony from the witnesses he wanted to testify was necessary in order to put on his best defense, but Hanlin did not think their testimony was necessary. In the letter, the defendant asked the court what steps he could take to rectify the situation.

¶ 6     At a pretrial hearing on August 18, 2015, the defendant explained to the trial court that he did not want a new attorney although he and trial counsel were having a disagreement. He further explained that his letter was meant to seek advice on how he could make sure his witnesses were called to testify. The court explained that it could either appoint a new attorney to represent him or he could proceed with Hanlin as his counsel. The defendant agreed to proceed with Hanlin if she was ready for trial, which she confirmed that she was.

¶ 7     On August 24, 2015, the defendant and Sanford's three-day jury trial commenced. Larry Clites testified that in December 2014, he lived with his wife, BethAnn or Beth,[2] her children, Nicholas Fowler and Kenneth Robnett, and a guest, Travis Parrish, on Lot No. 48 in the Cedar Lane Mobile Home Park. Just after midnight on December 11, 2014, Larry, Beth, and their neighbor, Francine Simpson, were all in the back bedroom of his trailer watching a movie. The children were asleep in the front bedroom and Parrish was in the

_____

[2]Because Larry and Beth Clites share a last name, we will refer to them individually by their first names for ease of reference.

living room. At approximately 12:30 a.m., Larry heard Parrish loudly scream his name. As Larry left the bedroom and began to walk down the hallway to check on Parrish, he saw three or four individuals wearing masks, t-shirts, or bandanas around their faces. They were standing behind Fowler and holding a gun to the back of his head. The man holding the gun wore a red cloth covering his face and a black hooded sweatshirt. Beth was behind Larry in the hallway when the gunman "ushered" them back into their bedroom.

¶ 8    According to Larry, once he, Beth, Simpson, Fowler, and three or four masked intruders were in the back bedroom, the intruders demanded "the shit" or "the stuff" and everyone's cell phones. They had Fowler sit on the bed, told him to shut up, and threatened to shoot him in the face. The men also grabbed Beth by the neck and pointed a gun to her head. Larry understood that the men were referring to the marijuana he had been selling out of the trailer. He went to his dresser and gave them an ounce of marijuana in a clear plastic bag. He testified that the men ransacked the bedroom and took approximately $500 to $700 in cash, Beth's and Francine's cell phones, and a pack of Newport cigarettes, in addition to the marijuana.

¶ 9    Larry recognized the voice of the gunman as someone he had previously sold marijuana to on two prior occasions, one of which was only a couple of days before the home invasion. When Larry told the man that he knew who he was, the men grabbed Larry, punched him in the face, and dragged him into the bathroom. The men then ran out of the trailer.

¶ 10    Simpson's version of the events was similar to those as described by Larry and Beth. She believed there were three intruders in the bedroom. Although Simpson tried to hide

4

behind a clothing rack in the bedroom, she saw a man wearing red pointing a gun at her and another man pointing a gun at Beth.

¶ 11   In addition to similarly describing the preceding events, Beth testified that the man who grabbed her was holding a gun but was not the man wearing red over his face. Although Beth could not identify the intruders, she could see their eyes and believed they were all African-American and armed with handguns. She was unsure as to whether there were three or four intruders, and she did not know whether they left on foot or in a vehicle.

¶ 12   Beth further testified that once the intruders left, she called 9-1-1 using Larry's cell phone, which was not stolen. She then called her mother, Dalonda Pendall, and asked her to come to the Clites' home because Pendall's cell phone was able to track Beth's phone. Beth's phone was part of Pendall's friends and family plan through AT&T. She explained that the AT&T Family Map application allowed a person to use one phone on the family plan to track other phones on the plan. When Beth opened the application from Pendall's phone at 1:36 a.m., she could see her phone's location on the map as 76 Gold Drive, and she showed it to a police officer. The State introduced a map into evidence, showing the 76 Gold Drive location where her phone first appeared on the AT&T Family Map application.

¶ 13   The application took approximately 30 seconds to refresh; Beth agreed that if the application showed her cell phone as stationary, then that meant it was in the same location, but if the phone moved, the application showed it in a different location. She testified that the application showed her phone moving on West Pleasant Hill Road; the officer she was with also saw the phone moving and radioed the locations to other officers. She and the

officer saw her stolen phone travel along West Pleasant Hill Road, then Country Club Road, and then Old Brick Road heading toward Murphysboro, Illinois.

¶ 14   Officer Blake Harsy of the Cardondale Police Department testified that he arrived at the Clites' trailer at approximately 12:53 a.m. on December 11, 2014, in response to a 9-1-1 call placed at 12:52 a.m. reporting a home invasion. Upon arrival, he was informed that Beth's and Simpson's cell phones were stolen. Harsy was present when Pendall arrived and Beth began tracking her phone.

¶ 15   Harsy and Beth began tracking her phone at around 1:36 a.m. According to the officer, Pendall's phone depicted a map with roads and a dot for the location of Beth's phone. The screen showed that the stolen phone was within 14 yards of 76 Gold Drive. The application would refresh every 20 to 30 seconds; the first few times it refreshed, the phone stayed at the location on Gold Drive, so Harsy assumed it was stationary. However, the phone's location began to move at approximately 1:40 a.m. Harsy saw the dot moving westbound on Pleasant Hill Road at 1:40:13 a.m., 1:41:27 a.m., and 1:43:48 a.m. He then saw the dot heading northbound on Country Club Road at 1:44:29 a.m. At 1:47:46 a.m., the dot began heading westbound on Old Route 13. With each movement, Harsy radioed the stolen phone's location to other officers.

¶ 16   After Harsy radioed the phone's location to other law enforcement officers, several officers drove to the address of 76 Gold Drive. One of the responding officers was Sergeant Jarin Dunnigan. On his way to 76 Gold Drive, Dunnigan arrived at the intersection of Pleasant Hill Road and South Illinois Avenue, which was near the Gold Drive address as indicated by the map introduced into evidence by the State. Dunnigan saw a single vehicle

6

approaching the intersection from the direction of 76 Gold Drive, traveling westbound on Pleasant Hill Road, and continuing straight through the intersection. The vehicle was an older, four-door, brown Cadillac. Dunnigan did not see any other vehicles on Pleasant Hill Road at that time. He then drove to the Gold Drive address, where he met with other officers. Upon his arrival, he heard Harsy's first radio dispatch that the dot representing Beth's stolen phone was on the move and traveling west on Pleasant Hill Road. Dunnigan had just seen the older, four-door, brown Cadillac traveling in that direction, and he radioed this information to other officers.

¶ 17    When Officer Timothy Lomax heard Harsy's radio dispatch that Beth's stolen phone was heading down Pleasant Hill Road, he was in his squad car near Main Street and Illinois Avenue. He stationed himself in the parking lot of a restaurant near the intersection of Old Route 13 and Country Club Road. While at that location, Lomax received Harsy's communication that the stolen phone had turned on Country Club Road and was heading north, and he realized the phone was heading in his direction. Lomax then saw an older, brown Cadillac approaching from the south, traveling north on Country Club Road, and then turning west onto Old Route 13. About 20 or 30 seconds later, Lomax heard Harsy's communication that the stolen phone was traveling westbound on Old Route 13. The officer did not see any other vehicles traveling in that direction at that time.

¶ 18    Lomax followed the Cadillac westbound on Old Route 13. The State introduced into evidence the video recording from Lomax's squad car, which depicted the officer following the Cadillac as well as the stop and search of the vehicle. While Lomax was following the vehicle, Harsy radioed that the stolen cell phone had tracked to a location on

7

Old Route 13 near the intersection of Gibbs Lane. At that time, Lomax and the Cadillac were traveling westbound on Old Route 13 and were approximately 500 feet west of Gibbs Lane. Lomax testified that Harsy's tracking information was consistent with the Cadillac's path of travel. Further, Lomax did not see any other vehicle traveling westbound on Old Route 13 during the relevant time.

¶ 19    At this point, Officer Mark Murray followed Harsy's dispatches and positioned his squad car directly behind Lomax's vehicle. Officer Jeff Withrow also heard the radio traffic and positioned his squad car behind Officer Murray's. Lomax then activated his squad car's flashing lights and stopped the Cadillac. The traffic stop occurred at 1:49 a.m., less than an hour after the police received the 9-1-1 call reporting the home invasion at the Clites' trailer.

¶ 20    Because the officers knew that firearms were reportedly used in the home invasion, they conducted a "felony stop," which meant that they ordered the occupants of the Cadillac to exit the car and approach them. Lomax testified that Sanford exited first from the driver's seat, Mosley exited from the backseat on the passenger side, and the defendant exited from the front passenger seat. Officers saw two cell phones in the map pocket attached to the back of the driver's seat; after Murray obtained the phone numbers to Beth's and Simpson's stolen phones, Withrow used his personal cell phone to call each of the numbers. The first call made by Withrow went straight to voicemail, but when he dialed the second number, the second phone in the map pocket began to audibly ring and light up. He interpreted that to mean that the stolen phone was the one located in the map pocket of Sanford's vehicle. Officers then removed the phones from the map pocket, and the one

8

that did not ring showed it had a missed call from Withrow's phone number. The phones were later identified as those reported stolen from the Clites' trailer.

¶ 21    Murray testified that officers searched the interior of Sanford's vehicle. In the backseat area, officers found a red shirt with the sleeves tied together in a knot, the two stolen cell phones, a plastic bag of marijuana, a pack of cigarettes, a gray long-sleeved shirt, and a black hooded sweatshirt. Larry identified the bag of marijuana and pack of cigarettes as similar to those stolen from him. Beth testified that the black hooded sweatshirt looked like one worn by one of the intruders and that the red shirt looked similar to the red cloth she saw covering the face of another one of the intruders. In the front of the vehicle, the officers found the defendant's and Sanford's cell phones.

¶ 22    Testifying on behalf of the State, Mosley stated that he, Sanford, and the defendant committed the home invasion at the Clites' residence. He admitted that he was testifying as part of his plea agreement with the State, in which he agreed to plead guilty to the charge of robbery in exchange for the State's promise to recommend a seven-year sentence and to not seek revocation of his probation on an unrelated case. He also admitted that he might only be required to serve four to six months in an impact incarceration program or "boot camp." Mosley said he understood that he was required to tell the truth during his testimony, and the prosecutor would determine if he was truthful as required by their agreement.

¶ 23    Mosley admitted that he had purchased marijuana from Larry at his trailer about four days before the home invasion; he testified that the Clites' trailer was located "[j]ust down the street" from his mother's house where he was living at the time. Mosley testified

9

that Sanford and the defendant picked him up from his mother's house around 11 p.m. on December 10, 2014. Although he and Sanford were friends, and he knew that Sanford was the defendant's brother, Mosley claimed that he had never met or hung out with the defendant prior to that night and that he did not know the defendant was going to be with Sanford when Sanford picked him up that night. Mosley testified that no one else got into Sanford's vehicle from the time that the two brothers picked him up until they were stopped by police a few hours later.

¶ 24 Mosley claimed that the three men first went to Mariah Herron's residence, which she shared with her brother, to smoke marijuana. However, the men did not smoke at Herron's trailer; instead, they left Herron's and returned to a parking lot near Mosley's mother's house to smoke inside the car. Mosley said that the defendant then developed the idea to rob Larry for "weed," and the defendant told Mosley that he only had to be a "lookout." The defendant gave Mosley a red shirt to cover his face, which he wore with black jogging pants and a black and gray hooded sweatshirt. He recalled that the other two men wore black hooded sweatshirts, hats, masks, and gloves.

¶ 25 According to Mosley, the three men walked to the Clites' trailer and entered through the open door, with the defendant entering first. He claimed that the defendant was the only one with a gun and that he did not know the defendant had a gun until the defendant pulled it from his waistband. The defendant told Larry he wanted the "weed" and then grabbed Beth around her neck. After Larry denied having any marijuana, the defendant retrieved the child from the front bedroom, choked him, and threw him to Beth, all while pointing his gun at them. After Beth told the men where the marijuana was located, Mosley

10

grabbed a bag of it from a bowl on top of the dresser. Mosley did not know where the gloves and masks came from or what happened to them and the gun after the men left the Clites' trailer.

¶ 26 Mosley testified that when Larry said he looked familiar, the defendant kicked Larry in the face. The three men then ran from the trailer, got into Sanford's vehicle, and drove back to Herron's residence. Mosley entered Herron's trailer first while Sanford and the defendant came in about four minutes later. The three men smoked the stolen marijuana in her room. Mosley thought they were at Herron's for about one hour; they left in Sanford's vehicle after the defendant turned on a scanner and heard police talking about the crime. Sanford drove while the defendant was in the front passenger seat and Mosley was in the backseat. Mosley claimed that when the police activated their lights to stop the vehicle, the defendant threw two cell phones and some marijuana at him, telling him to put the phones in his pocket and the marijuana in his underwear. Mosley kicked the marijuana under the seat.

¶ 27 Mosley admitted that he lied to the police numerous times and told them several different versions about what happened on the night of the home invasion. He also admitted that his deoxyribonucleic acid (DNA) was on the red shirt in the back of Sanford's vehicle. Although Mosley admitted he had recently purchased marijuana from Larry, he asserted that the defendant was the one who suggested robbing him because he had been researching him and knew he had the "best weed."

¶ 28 Detective Aaron Baril testified that the defendant told him that Sanford and Mosley came to his mother's home on North Marion Street in Sanford's vehicle. The defendant

told Baril that the men were on their way to Murphysboro when they were stopped by the police. The defendant said he did not know anything about the stolen cell phones. According to Baril, the defendant subsequently changed his story and told the officers that after Sanford and Mosley picked him up, they stopped at Herron's trailer. Baril explained that Herron lived with her brother on Gold Drive, a mobile home park off of East Pleasant Hill Road. The defendant did not volunteer the information about the trip to Herron's trailer; rather, he only admitted that they stopped there after being confronted with the information. The defendant told Baril he originally omitted that detail because they smoked marijuana there, and he did not want to get Herron's brother, who was on parole, in trouble. He admitted that no one else had been in Sanford's vehicle from the time the three men got into it earlier that night until they were later stopped by the police.

¶ 29    Additionally, Baril testified that Sanford told him that Sanford went to pick the defendant up from their mother's house but fell asleep while he was waiting, and Mosley got into the backseat of the vehicle uninvited. Sanford claimed that the three men were driving to Murphysboro when they were stopped by the police. However, Sanford subsequently admitted that they had stopped at Herron's house. Sanford and the defendant voluntarily consented to a search of their cell phones.

¶ 30    Detective Brandon Weisenberger testified that he got a search warrant for the defendant's cell phone records from Verizon. Using the records he obtained, Weisenberger was able to determine the approximate locations of the defendant's phone on the night of the home invasion, both before and after the Clites' 9-1-1 call. Weisenberger testified that between 12:19 a.m. and 12:26 a.m., those locations were near the Cedar Lane Mobile Home

12

Park. He testified that 10 minutes before the 9-1-1 call, the defendant's phone pinged to "[a]n area northeast of the mobile home park in question" and that five minutes after the call, the phone was "in the approximate area on East Pleasant Hill Road near a trailer park on what we know as Gold Drive."

¶ 31 According to Weisenberger, the defendant's phone remained at Gold Drive for several minutes. The phone began moving at 1:36 a.m., heading westbound on Pleasant Hill Road, and that it took a path of travel that was consistent with the path of Beth's stolen cell phone. Weisenberger also testified that he looked through the defendant's and Sanford's phones, and by reviewing a series of text messages, he determined that the two met up with each other around 11:50 p.m. on December 10, 2014, or about one hour before the Clites' 9-1-1 call.

¶ 32 Defense counsel asked Weisenberger on cross-examination about the width of the cell phone's approximate locations; Weisenberger responded that it was his understanding that there was "no science to it" and it "depends on several factors." When Weisenberger testified that the defendant's phone was at a location, he was "not sure" how precise that information was.

¶ 33 After the State rested its case, the defense filed a motion for directed verdict, which was denied. The defendant did not testify or present any evidence in his defense.

¶ 34 During closing argument, the State first reminded the jury of the path taken by Beth's stolen cell phone, as shown by the tracking application. The State recalled Weisenberger's testimony that Sanford and the defendant met up at 11:45 or 11:50 on the evening of December 10, 2014, which was 40 minutes before the home invasion, and were

13

stopped at 1:49 a.m. with the stolen cell phones. Although the State conceded that Mosley was not "100 percent believable," it argued, "And the one thing and the very first thing I want you to remember is that Elijah Mosley admitted and acknowledged his role in this and that, if nothing else, is worthy of belief." The State continued, arguing that there were "points upon which Elijah Mosley's statement can not [*sic*], in any way, be doubted because they have been corroborated by the statements of these two individuals or the cellphone records from these two individuals' cellphones." The State told the jury, "[W]e know from the Verizon tracking of Mr. Vinson's cellphone in that car that Mr. Vinson's cellphone, from the time right before the robbery, until the time it was found at Gold Drive, was in the vicinity of Cedar Lane Mobile Home Park and South Illinois Avenue just like Elijah Mosley said."

¶ 35    Defense counsel argued that Mosley committed the home invasion, lied repeatedly to the police, was not believable, and there was no evidence connecting the defendant to the crime. Counsel then reminded the jury that the stolen property was found near where Mosley sat in the backseat and that he was getting a "sweetheart deal" for testifying on behalf of the State. Counsel pointed out that there were no gloves, guns, or masks in the car, nor any explanation as to where those items were located. Counsel argued that the defendant had no reason to steal a phone when he had his own cell phone in the car.

¶ 36    On rebuttal, the State argued that text messages showed the three men were together from 11:45 p.m. on December 10, 2014, and that they were never out of each other's company for the next two hours.

¶ 37 The jury was instructed, *inter alia*, that: "Neither opening statements nor closing arguments are evidence"; "Only you are the judges of the believability of the witnesses and of the weight to be given to the testimony of each of them"; and "When a witness says that he or she was involved in a commission of a crime with the defendant, the testimony of that witness is subject to suspicion and should be considered by you with caution. It should be carefully examined in the light of the other evidence in the case."

¶ 38 The jury found the defendant and Sanford guilty of home invasion and further found that each individual, or one for whose conduct he was legally responsible, was armed with a firearm during the commission of the charged offense. The jury did not enter a finding that any victim was under the age of 12 at the time of the offense.

¶ 39 On September 14, 2015, the defendant and Sanford filed a joint *pro se* motion for a new trial alleging, *inter alia*, that counsel was ineffective for failing to call witnesses. As for the defendant's prior decision that Hanlin should represent him during the trial, the motion explained, "I said I wanted to keep [my] attorney because I thought we'd come to an understanding and get the videos and witnesses I'd requested." On that same date, Hanlin again moved to withdraw as the defendant's counsel; attached to her motion was a copy of the defendant's letter to the trial court. The court allowed Hanlin to withdraw and appointed posttrial counsel to represent the defendant.

¶ 40 On September 21, 2015, posttrial counsel filed a motion for a new trial and a subsequent amended motion arguing that the State failed to prove the defendant guilty beyond a reasonable doubt, and that his trial counsel was ineffective for failing to call

witnesses that the defendant wanted to testify and for failing to object to the prosecutor's improper questioning.

¶ 41    On March 18, 2016, a hearing was held on the matters of posttrial motions and sentencing.  The defendant's posttrial counsel asserted, *inter alia*, (1) that his trial counsel was ineffective for failing to object when the prosecutor solicited testimony from Mosley that the prosecutor himself would determine whether Mosley was being truthful, and (2) that trial counsel was ineffective for failing to call witnesses on the defendant's behalf. In response, the State argued there had been no proffer regarding what witnesses should have been called or what their testimony would have been and that the trial court could not determine whether counsel was ineffective without such a proffer.  The court denied the motions for new trial and proceeded to sentencing.

¶ 42    In his statement of allocution, the defendant complained, "[T]he reason why my [trial] counsel didn't know anything about my witnesses because just like my counsel right now, when I'm trying to tell him something, they're ignoring me."  He further complained that he was trying to tell posttrial counsel "something to add that may be helpful, and he didn't even, he just shushed me."  As to his trial counsel, the defendant maintained that she never called his witnesses because she believed the State's case against him was weak.  He continued, "I had a witness that could account to my whereabouts the night of the crime, and I had, I got a written statement from both her and her mother saying where I was at during the time of the crime.  These never got into play because my lawyer refused to take them."

16

¶ 43    As to his sentence, the defendant stated that he was wrongfully convicted, that the State had a "personal vendetta" against him, and that his and Sanford's children would be affected if the men were sentenced to 21 to 45 years' imprisonment.  The State then clarified that although the defendant had referred to a sentence of 21 to 45 years, which included the firearm enhancement, he would actually be subject to an extended-term sentence under section 5-5-3.2(b)(3)(i) of the Unified Code of Corrections (730 ILCS 5/5-5-3.2(b)(3)(i) (West 2014)).  The State contended that because Fowler was a victim of the home invasion and was under 12 years old at that time, the defendant should be eligible for a sentence of up to 60 years plus the 15-year firearm enhancement, for a total of 75 years.  The State told the trial court that the sentence enhancement was not mandatory but that it would be up to the court's discretion if the court found that Fowler was a victim under the age of 12 when the home invasion occurred.

¶ 44    The trial court found that Fowler "was a victim in this case," was nine years old when the home invasion occurred, and "[t]hat enhances the sentencing provision to make it extended term."  The court sentenced the defendant to 50 years' imprisonment as to home invasion and 15 years' imprisonment pursuant to the firearm sentencing enhancement, to be followed by 3 years of MSR.  The court subsequently found the defendant was entitled to 464 days of credit for time spent in presentence custody.  The mittimus entered by the court on March 22, 2016, does not address or impose any fines or fees against the defendant.

¶ 45    The defendant filed his notice of appeal on March 23, 2016.

17

¶ 46                                    II. ANALYSIS

¶ 47    On appeal, the defendant makes four contentions. First, he argues that he was denied effective assistance of counsel. Second, he asserts that the trial court did not sufficiently inquire into his *pro se* claims of ineffective assistance of counsel. Third, he contends that the court improperly enhanced his sentence. Fourth, he requests that this court amend the mittimus "to reflect the $5 *per diem* credit toward fines and fees for time that [he] spent in custody prior to sentencing."

¶ 48                        A. Ineffective Assistance of Counsel

¶ 49    The defendant first argues that he was denied effective assistance of counsel. The defendant asserts that trial counsel was ineffective in: (1) failing to object to a portion of Detective Weisenberger's testimony, (2) failing to object to a portion of the State's examination of Mosley, and (3) failing to object to the State's references to Mosley's credibility during its closing argument. The defendant alleges that he was prejudiced by his trial counsel's individual errors and that the cumulative effect of the errors denied him a fair trial. Additionally, the defendant contends his posttrial counsel was ineffective for failing to raise the issue of Weisenberger's testimony in a posttrial motion.

¶ 50    Our review of ineffective assistance of counsel claims is guided by the standards set forth in *Strickland v. Washington*, 466 U.S. 668, 687 (1984), and adopted by our supreme court in *People v. Albanese*, 104 Ill. 2d 504, 526 (1984). To succeed on a claim of ineffective assistance of counsel under the *Strickland* standard, one must show both that (1) counsel's representation fell below an objective standard of reasonableness (deficient performance prong) and (2) a reasonable probability exists that, but for the error, the result

18

would have been different (prejudice prong). *People v. Manning*, 241 Ill. 2d 319, 326-27 (2011). A defendant must satisfy both prongs of the *Strickland* test to succeed on a claim of ineffective assistance of counsel. *People v. Evans*, 209 Ill. 2d 194, 220 (2004). Thus, defendant's failure to establish either deficient performance or prejudice will be fatal to the claim. *People v. Richardson*, 189 Ill. 2d 401, 411 (2000).

¶ 51 To establish deficiency under the first prong of the *Strickland* test, "defendant must overcome the strong presumption that the challenged action or inaction might have been the product of sound trial strategy." *People v. Evans*, 186 Ill. 2d 83, 93 (1999). The reviewing court must evaluate counsel's performance from her perspective at the time rather than "through the lens of hindsight." *People v. Perry*, 224 Ill. 2d 312, 344 (2007). An evaluation of counsel's actions cannot extend into matters involving the exercise of judgment, strategy, or trial tactics. *People v. Penrod*, 316 Ill. App. 3d 713, 722 (2000). "Reviewing courts should hesitate to second-guess counsel's strategic decisions, even where those decisions seem questionable." *Manning*, 241 Ill. 2d at 335.

¶ 52 To establish prejudice, "defendant must show that counsel's deficient performance rendered the result of the trial unreliable or the proceeding fundamentally unfair." *Richardson*, 189 Ill. 2d at 411. If defendant's claim can be disposed of on the basis that he suffered no prejudice, then a court should not decide whether counsel's performance was deficient. *People v. Villanueva*, 382 Ill. App. 3d 301, 308 (2008).

¶ 53 The defendant initially claims trial counsel was ineffective for failing to object to Weisenberger's testimony, based on the defendant's cell phone records, as to the approximate locations of his phone on the night of the home invasion, both before and after

the Clites' 9-1-1 call. The defendant contends that this testimony was inadmissible hearsay. We disagree. Assuming *arguendo* that counsel's performance was deficient, we agree with the State that the defendant was not prejudiced as a result of the alleged error. The record reveals that the defendant's movements as testified to by Weisenberger were corroborated through other evidence, and as such, there is sufficient evidence to support the conviction even without Weisenberger's testimony. First, Mosley's testimony specifically placed the defendant in the Clites' trailer in the Cedar Lane Mobile Home Park during the home invasion; his testimony was consistent with the victims' testimony on this point, as they testified that they saw three or four masked men during the home invasion. Mosley also testified that Sanford and the defendant picked him up around 11 p.m. on December 10, 2014, that the three men returned to Herron's trailer on Gold Drive immediately after the home invasion, and that no one else got into the vehicle from the time the two brothers picked him up until the time they were stopped by the police a few hours later. Second, Detective Baril's testimony revealed that the defendant admitted he was with Sanford and Mosley in Sanford's vehicle on the night of the home invasion, that the three men went to Herron's trailer on Gold Drive, and that no one else had been in Sanford's vehicle from the time he was picked up earlier that night until the time they were stopped by the police.

¶ 54 Finally, several officers testified as to their personal observations and tracking of Sanford's vehicle from the time it left Gold Drive until it was stopped. When Officer Harsy radioed the location of Beth's stolen phone as 76 Gold Drive, Sergeant Dunnigan drove to that address and personally observed Sanford's vehicle coming from the direction of that

20

location and traveling westbound on Pleasant Hill Road. Dunnigan and Officer Lomax both testified as to their personal observations that Sanford's vehicle took a path of travel that was consistent with the movements of Beth's stolen phone per Harsy's radio transmissions. The foregoing reveals that Weisenberger's testimony was cumulative of and corroborated by other properly admitted testimony identifying the defendant and his part in the home invasion. The defendant cannot demonstrate prejudice when other independent evidence sufficiently supported the jury's verdict.

¶ 55 In support of his claim, the defendant relies on *People v. Ramos*, 2018 IL App (1st) 151888. In that case, the First District determined that a detective's testimony about defendant's historical cell site analysis (HCSA) was inadmissible hearsay, and because the error in admitting the hearsay testimony was not harmless, reversed and remanded the matter for a new trial. *Id.* ¶¶ 18-25. We find *Ramos* distinguishable, however, for two important reasons. Importantly, the *Ramos* court was not reviewing a claim of ineffective assistance of counsel under *Strickland*, and thus, the standard of prejudice was different than the standard applicable in this case. Compare *Ramos*, 2018 IL App (1st) 151888, ¶¶ 24-25 (applying a harmless error standard), with *Richardson*, 189 Ill. 2d at 411 (explaining that *Strickland* prejudice is more than an "outcome-determinative" test). Additionally, central to the *Ramos* court's decision was the fact that there was no other evidence putting defendant inside the vehicle that followed the victim. 2018 IL App (1st) 151888, ¶ 25. As such, the hearsay testimony prejudiced defendant because it allowed the jury to make an "inferential leap" in order to conclude that defendant was at the crime

scene. *Id.* In contrast, no inferential leap was required in the present case because Mosley's testimony explicitly placed the defendant at the crime scene.

¶ 56    Based on the foregoing analysis, we find there is no reasonable probability that a different result would have occurred without the admission of Weisenberger's testimony as to the approximate locations of the defendant's phone on the night of the home invasion. Similarly, there is no reasonable probability that a different result would have occurred had posttrial counsel raised the issue in a posttrial motion. As the defendant has failed to prove he was prejudiced as a result of such alleged errors, his claims of ineffective assistance of counsel must fail.

¶ 57    The defendant also claims trial counsel was ineffective for failing to object to a portion of the State's examination of Mosley and to subsequent references to his credibility during the State's closing argument. We disagree. The State is prohibited from vouching for a witness's credibility. *People v. Garcia*, 231 Ill. App. 3d 460, 473 (1992). However, it is not improper for the State to elicit testimony that a witness has entered into a plea agreement which requires him or her to provide truthful testimony, so long as the State does not suggest that it possesses information about the witness's veracity that the jury does not have. See *id.* As pronounced by the Second District:

> "A prosecutor who causes the promise of a witness to provide truthful testimony pursuant to a plea agreement to be revealed has only revealed that the witness agreed to tell the truth; the prosecutor has not expressed a personal opinion as to whether the witness has actually complied with the agreement by telling the truth. Therefore, we conclude that bringing forth such an agreement does not constitute improper vouching for the credibility of the witness." *Id.*

22

¶ 58    Here, the defendant complains of the following portion of the State's direct examination of Mosley, which directly followed Mosley's testimony detailing the terms of his plea agreement with the State:

> "Q. Now, are you also aware that as part of this agreement, there is one person, one person, alone, who makes the determination as to whether you're being truthful?
> A. Yes.
> Q. And who is that person?
> A. You.
> Q. Me; right?
> A. Yes.
> Q. And so you know, do you not, that if you don't tell the truth, or I believe you're not telling the truth, you do not get the benefit of this deal?
> A. Yes."

Our review of the record leads us to conclude that the foregoing did not constitute improper vouching for Mosley or a "usurpation of the jury's role in determining Mosley's credibility." Instead, the State merely elicited testimony demonstrating that under the plea agreement, Mosley agreed to tell the truth during his testimony and that the State would determine whether Mosley fulfilled that obligation. Because the State's questions were not improper, an objection to them would have been meritless, and we will not find trial counsel ineffective for failing to assert it. See *People v. Bradford*, 2019 IL App (4th) 170148, ¶ 14 (defense counsel will not be found ineffective for failing to assert a meritless objection).

¶ 59    As to closing argument, the State is generally allowed to comment on a witness's credibility so long as the remarks are based on the evidence presented or reasonable inferences therefrom. *People v. Pope*, 284 Ill. App. 3d 695, 706 (1996). The State is also entitled to assume the truth of its evidence against a defendant. *People v. Rivera*, 262 Ill.

23

App. 3d 16, 27 (1994). However, a prosecutor is not allowed to personally vouch for or express his personal opinion as to the credibility of a witness (*Pope*, 284 Ill. App. 3d at 707), or to put the integrity of the state's attorney's office behind a witness's testimony (*Rivera*, 262 Ill. App. 3d at 27). A prosecutor violates this rule if he explicitly states that he is asserting his personal views as to a witness's credibility. *Pope*, 284 Ill. App. 3d at 707. On the other hand, a prosecutor does not improperly assert his personal views about a witness's credibility if the jury must infer that the prosecutor is doing so based on his comments. *Id.*

¶ 60    In this case, the defendant complains of the following remarks made during the State's closing argument. The State argued, "And the one thing and the very first thing I want you to remember is that Elijah Mosley admitted and acknowledged his role in this and that, if nothing else, is worthy of belief." It continued, arguing that there were "points upon which Elijah Mosley's statement can not [*sic*], in any way, be doubted because they have been corroborated by the statements of these two individuals or the cellphone records from these two individuals' cellphones." The State told the jury, "[W]e know from the Verizon tracking of Mr. Vinson's cellphone in that car that Mr. Vinson's cellphone, from the time right before the robbery, until the time it was found at Gold Drive, was in the vicinity of Cedar Lane Mobile Home Park and South Illinois Avenue just like Elijah Mosley said." We find these statements fell within the bounds of permissible comments directed at Mosley's credibility and the evidence in the case. Unlike the cases relied on by the defendant, *People v. Roach*, 213 Ill. App. 3d 119, 123-24 (1991), and *People v. Valdery*, 65 Ill. App. 3d 375, 378 (1978), the State in this case did not explicitly announce that it

24

was asserting its personal views as to Mosley's credibility, and thus, its argument was not improper. Because an objection to the State's closing argument would have been meritless, trial counsel will not be found ineffective for failing to assert it. See *Bradford*, 2019 IL App (4th) 170148, ¶ 14 (defense counsel will not be found ineffective for failing to assert a meritless objection).

¶ 61 Finally, the defendant argues that, even if none of defense counsels' errors justify reversal of his conviction and a new trial, the cumulative effect of such errors does. According to the preceding analysis, we have found that trial counsel did not err in failing to object to a portion of the State's examination of Mosley and to subsequent references to his credibility during the State's closing argument. We further found that even if we were to assume that trial counsel or posttrial counsel erred with respect to Weisenberger's testimony, the defendant has failed to show he was prejudiced as a result. In light of our conclusions, the defendant was not prejudiced by any cumulative effect of such alleged errors, and his argument must fail. See *Garcia*, 231 Ill. App. 3d at 478 (similarly finding).

¶ 62                                    B. *Krankel*

¶ 63 The defendant next asserts that his cause should be remanded for further proceedings in accordance with *People v. Krankel*, 102 Ill. 2d 181 (1984), because the trial court did not sufficiently inquire into his claims of ineffective assistance of counsel. We disagree.

¶ 64 Under *Krankel* and its progeny, the trial court is obligated to inquire into a defendant's *pro se* posttrial claims that he was denied the effective assistance of counsel.

25

*People v. Ayres*, 2017 IL 120071, ¶ 11; *People v. Moore*, 207 Ill. 2d 68, 77-78 (2003). This inquiry, which is sometimes referred to as a "preliminary *Krankel* inquiry" (*People v. Jolly*, 2014 IL 117142, ¶ 28), requires the court to ascertain the nature of defendant's ineffective assistance of counsel claims and evaluate their potential merits (*People v. Mays*, 2012 IL App (4th) 090840, ¶ 58). To understand the factual bases of defendant's allegations, it is proper for the court to question both trial counsel and defendant. *Ayres*, 2017 IL 120071, ¶ 12. If defendant's allegations show that trial counsel may have neglected defendant's case, the court should appoint new counsel and set the matter for a hearing. *Id*. ¶ 11; *Moore*, 207 Ill. 2d at 78. If the court determines that the claims lack merit or pertain only to matters of trial strategy, however, then no further action is required. *Id*. A preliminary *Krankel* inquiry "serves the narrow purpose of allowing the trial court to decide whether to appoint independent counsel to argue a defendant's *pro se* posttrial ineffective assistance claims." *People v. Patrick*, 2011 IL 111666, ¶ 39.

¶ 65    A defendant's *pro se* claim lacks merit if it is misleading, conclusory, or legally immaterial or fails to " 'bring to the trial court's attention a colorable claim of ineffective assistance of counsel.' " *People v. Cook*, 2018 IL App (1st) 142134, ¶ 104 (quoting *People v. Johnson*, 159 Ill. 2d 97, 126 (1994)). "The court may, of course, rely on its own legal knowledge of what does and does not constitute ineffective assistance." *Mays*, 2012 IL App (4th) 090840, ¶ 57. The court may also base its evaluation of defendant's claims on its knowledge of counsel's performance at trial and "the insufficiency of the defendant's allegations on their face." *Moore*, 207 Ill. 2d at 79.

¶ 66    "The operative concern for the reviewing court is whether the trial court conducted an adequate inquiry into the defendant's *pro se* allegations of ineffective assistance of counsel." *Id*. at 78. Whether the court properly conducted a preliminary *Krankel* inquiry is a legal question reviewed *de novo*. *Jolly*, 2014 IL 117142, ¶ 28.

¶ 67    On appeal, the defendant contends that the trial court failed to inquire into his allegation that trial counsel ignored his requests and failed to call alibi witnesses that he wanted to testify at his trial. The defendant further maintains that his posttrial counsel, who was appointed after the defendant filed his *pro se* posttrial motion alleging ineffective assistance of trial counsel, had ignored him regarding his claim about the alibi witnesses. The record reveals, however, that the court complied with *Krankel* when it appointed posttrial counsel to represent the defendant after he made his *pro se* allegations and after trial counsel was permitted to withdraw from the case. Thereafter, posttrial counsel included the defendant's *pro se* claim in an amended motion for new trial and the court heard arguments on the matter during a posttrial hearing. The court also heard from the defendant during his statement of allocution, in which he further argued about his allegation that trial counsel was ineffective for failing to call witnesses that would have testified to an alibi for him and also alleged that his posttrial counsel was ignoring him.

¶ 68    Viewing the defendant's ineffective assistance of counsel allegations in the context of the entire record on appeal, we conclude that the court's preliminary *Krankel* inquiry was sufficiently thorough and supported the court's denial of the defendant's posttrial motions. The court appointed posttrial counsel to represent the defendant after he made such claims, and it heard arguments from posttrial counsel and the defendant on the matter.

27

The court then rightfully rejected the defendant's claims based on its firsthand knowledge of counsels' performance during the trial and posttrial proceedings. Having so concluded, no further action was required of the court.[3]

¶ 69                                         C. Sentencing

¶ 70    The defendant also contends that the trial court improperly enhanced his sentence based on the age of a victim, and thus, his sentence must be vacated, and the cause remanded for resentencing. The State concedes that the court improperly imposed an extended-term sentence but argues that we should exercise our authority under Illinois Supreme Court Rule 615(b)(4) (eff. Jan. 1, 1967) to reduce the defendant's sentence to the maximum allowable sentence, instead of remanding the case for a new sentencing hearing.

¶ 71    Initially, we note that although the defendant failed to challenge the imposition of the extended-term sentence at the sentencing hearing or in a posttrial motion, "the erroneous imposition of an extended-term sentence is routinely reviewed as second-prong plain error." *People v. Ramsey*, 2018 IL App (2d) 151071, ¶ 32.

¶ 72    In *Apprendi v. New Jersey*, 530 U.S. 466 (2000), the Supreme Court held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." *Id.* at 490. The Illinois legislature codified the *Apprendi* rule in

---

[3]Prior to oral argument in this matter, the State filed a motion to cite additional authority. The State asks us to consider *People v. Custer*, 2019 IL 123339. While we have granted the State's motion, we find that *Custer* is not pertinent to our determination of this appeal.

section 111-3(c-5) of the Code of Criminal Procedure of 1963 (725 ILCS 5/111-3(c-5) (West 2014)). The statute provides in relevant part:

> "(c-5) Notwithstanding any other provision of law, in all cases in which the imposition of the death penalty is not a possibility, if an alleged fact (other than the fact of a prior conviction) is not an element of an offense but is sought to be used to increase the range of penalties for the offense beyond the statutory maximum that could otherwise be imposed for the offense, the alleged fact must be included in the charging instrument ***, submitted to a trier of fact as an aggravating factor, and proved beyond a reasonable doubt. Failure to prove the fact beyond a reasonable doubt is not a bar to a conviction for commission of the offense, but is a bar to increasing, based on that fact, the range of penalties for the offense beyond the statutory maximum that could otherwise be imposed for that offense." *Id.*

¶ 73    In this case, the defendant was convicted of home invasion with a sentencing range of 6 to 30 years' imprisonment, and based on the jury's finding that he, or one for whose conduct he was legally responsible, was armed with a firearm during the commission of the offense, he was eligible for an extended-term sentence of between 21 and 45 years' imprisonment. The State did not charge, provide notice of, or ask the jury to find that any victim was under the age of 12 at the time of the offense. Nevertheless, the State contended at the defendant's sentencing hearing that because Nicholas Fowler was a victim of the home invasion and under 12 years of age at the time the offense occurred, the defendant was eligible for a sentence of up to 60 years plus the 15-year firearm enhancement, for a total of 75 years. Based upon its finding that Fowler "was a victim in this case" and nine years old at the time of the home invasion, the trial court sentenced the defendant to an extended term of 50 years' imprisonment as to the home invasion plus 15 years' imprisonment pursuant to the firearm sentencing enhancement, to be followed by 3 years of MSR. Thus, the record reveals the court imposed a sentence that violated *Apprendi* as

29

well as section 111-3(c-5) because it was enhanced pursuant to a fact, other than a prior conviction, that was not included in the indictment, not proven beyond a reasonable doubt, and not submitted to the jury. The imposition of such a sentence constituted second-prong plain error.

¶ 74 We now turn to the State's contention that we should reduce the defendant's sentence without remanding the case for a new sentencing hearing. A reviewing court should not assume that a trial court will simply resentence a defendant to the maximum allowable sentence, especially when a significant amount of time has passed since the imposition of defendant's original sentence. *People v. King*, 248 Ill. App. 3d 253, 280-81 (1993). As the defendant in this case was sentenced over three years ago, the court should have the opportunity to determine what, if any, additional modifications are appropriate upon resentencing. See *People v. Williams*, 66 Ill. 2d 478, 487 (1977) (remanding for resentencing when defendant was sentenced two years before sentence was vacated); *King*, 248 Ill. App. 3d at 280-81 (remanding for resentencing when defendant was sentenced four years before the sentence was vacated). While we are cognizant of the need for judicial economy, we also recognize that the trial court is in the best position to impose a sentence "consistent with the protection of the public, the gravity of the crime, and the rehabilitative need of the defendant." (Internal quotation marks omitted.) *King*, 248 Ill. App. 3d at 281. Accordingly, we vacate the defendant's sentence and remand this case for resentencing on the defendant's conviction for home invasion with a firearm.

¶ 75                                    D. Mittimus

¶ 76    Lastly, the defendant requests that this court amend the mittimus "to reflect the $5 *per diem* credit toward fines and fees for time that [he] spent in custody prior to sentencing." In response, the State argues that because the mittimus does not impose any fines against the defendant, he has failed to show he is entitled to relief.

¶ 77    Section 110-14(a) of the Code of Criminal Procedure of 1963 (725 ILCS 5/110-14(a) (West 2014)) states as follows:

> "(a) Any person incarcerated on a bailable offense who does not supply bail and against whom a fine is levied on conviction of such offense shall be allowed a credit of $5 for each day so incarcerated upon application of the defendant. However, in no case shall the amount so allowed or credited exceed the amount of the fine."

The statute's plain language indicates that it applies only to fines imposed by the trial court; it does not apply to fees. *People v. Guadarrama*, 2011 IL App (2d) 100072, ¶ 8.

¶ 78    Pursuant to our preceding discussion set out in section II.C. above, we have vacated the defendant's sentence and are remanding for resentencing. Thus, we need not address the merits of the defendant's final contention on appeal. However, we note that if the trial court does impose any fines against the defendant, he shall be awarded the $5 *per diem* credit in accordance with section 110-14(a). The defendant is not entitled to a credit against fees assessed against him. See *id.*; *Guadarrama*, 2011 IL App (2d) 100072, ¶ 8.

¶ 79                                    III. CONCLUSION

¶ 80    For the foregoing reasons, we affirm the defendant's conviction for home invasion with a firearm. However, we vacate the sentence imposed by the circuit court of Jackson County and remand the cause for a new sentencing hearing. Upon resentencing, the court

shall determine whether the defendant is entitled to credit against any fines imposed upon him in a manner consistent with this order.

¶ 81    Affirmed in part and vacated in part; cause remanded.