2021 IL App (2d) 190977-U
No. 2-19-0977
Order filed December 2, 2021

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

_____

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | No. 16-CF-1894 |
| SAYVON D. JONES, | ) ) ) | Honorable Jeffrey S. MacKay, |
| Defendant-Appellant. | ) | Judge, Presiding. |

_____

JUSTICE ZENOFF delivered the judgment of the court.
Justices Schostok and Hudson concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Defendant's 24-year sentence for armed robbery with a firearm, which included a 15-year firearm enhancement, was not an abuse of discretion where the base sentence was three years above the minimum for a Class X felony and the trial court appropriately weighed the pertinent factors in aggravation and mitigation.

¶ 2    After a bench trial, defendant, Sayvon D. Jones, was convicted of armed robbery with a firearm (720 ILCS 5/18-2(a)(2) (West 2016)) and unlawful possession of a weapon (firearm) by a convicted felon (*id.* § 24-1.1(a)).  Armed robbery was a Class X felony (*id.* § 18-2(b)) and thus had a sentencing range of 6 to 30 years' imprisonment (see 730 ILCS 5/5-4.5-25(a) (West 2016)). There was a mandatory 15-year add-on because defendant used a firearm while he committed the

crime (see 720 ILCS 5/18-2(b)) (West 2016)).  The trial court sentenced defendant to concurrent prison terms of 24 years for armed robbery with a firearm and 5 years for unlawful possession of a firearm.  The court denied his motion to reconsider his sentences.  On appeal, defendant contends that his sentence for armed robbery with a firearm is excessive.  We affirm.

¶ 3                                   I. BACKGROUND

¶ 4      We summarize the pertinent trial evidence.  Gregory Brate, a forensic scientist for the Illinois State Police, testified that he examined People's exhibit No. 1-A, a firearm used in this case, and determined that it was operable as received.  Abigail Medina, a 911 dispatcher, testified that at about 6:06 p.m. on October 20, 2016, she received an emergency call from Christopher Ray.  The Glendale Heights police were dispatched.  Medina identified a recording of Ray's call to her.  In the call, Ray said that he had just been robbed at gunpoint by two men.  The one holding the gun was wearing a gray sweater and had short hair.  The other man had dreadlocks and was wearing a green sweater.

¶ 5      Ray testified on direct examination as follows.  Asked whether he wanted "to be here at all right now," he testified, "Hell no."  He was there under subpoena.  Asked where he was on October 20, 2016, Ray testified, "I don't really remember."  At some point, he went to Glendale Heights to visit his friend "Shay" at her apartment.  At about 6 p.m., he stepped outside to smoke and call his cousin.  Two African-American men approached him.  He and the men went inside a basement laundry room.  Ray could not remember whether one of the men was Timothy Walls.  Ray did not recall whether he saw a gun.  He vaguely recalled that someone took his phone from him.  He did not recall whether anyone took money or cigarettes from him.

¶ 6      Ray testified that he and the men left the room and went separate ways.  Ray walked to the Brunswick Zone, a bowling alley.  Later that evening, he went to the police station, where a

detective interviewed him. Ray testified that he could recall little about the interview. He repeatedly claimed that he could not remember statements that the prosecutor quoted to him. The prosecutor quoted him talking about how he, "Tim," and "Sayvon" knew one another; Ray "vaguely recall[ed] something along those lines." Ray acknowledged telling the detective that he remembered playing basketball with defendant and Walls years ago.

¶ 7 Ray testified that he could not recall whether defendant ever put a gun to his head, but he conceded that he said so to the detective. Ray conceded that, outside the Brunswick Zone with the police, he identified Walls, but he said that he did not recall seeing defendant there. Ray "vaguely remember[ed]" telling the detective that Walls did not have a gun but defendant did. He remembered describing specifically the money that defendant took from him.

¶ 8 At one point, Ray responded to a question by asking whether he could "plead the Fifth." The court said no.

¶ 9 On cross-examination, Ray testified that he did not recall seeing defendant on October 20, 2016. He did recall telling the detective that, after the other men left the laundry room, he tried to chase after them and, "only after they got away," he went to the Brunswick Zone to call the police. On redirect, Ray testified that he did not lie to the police when he told them that defendant held a gun up to him and took his cigarettes, money, and phone.

¶ 10 Robert Hawco, a Glendale Heights police officer, testified that, on the evening of October 20, 2016, he drove to the area of a reported armed robbery. Two men later identified as Walls and defendant were walking together near the Brunswick Zone. The men started running. Eventually, another officer took defendant into custody. Hawco soon saw Officer Ryan Sheehan take Walls into custody. Hawco returned to where defendant was being held. Defendant had a dark backpack. After conducting a show-up identification with Ray, Hawco took defendant to the police station.

He recovered loose change from defendant's pockets and cigarettes and Ray's phone from the backpack.

¶ 11    Glendale Heights police chief Doug Flint testified that, on the evening of October 20, 2016, he retraced the route taken by defendant and Walls. He found a gun in a gutter near a residential garage. He did not check the chamber of the gun, but the magazine was in place and "[i]t felt like a loaded weapon." At trial, it was admitted as People's exhibit No. 1-A.

¶ 12    Julie Wessel, a forensic scientist with the state police crime laboratory, testified that she tested the gun for fingerprints. She found one latent impression that matched defendant's standard.

¶ 13    Walls testified on direct examination as follows. He had been charged in this case with armed robbery, aggravated robbery, and two counts of possession of a controlled substance. He and the State had agreed that, in return for his truthful testimony here, he would plead guilty to aggravated robbery, the State would recommend a sentence of two years' probation, and the other charges would be dismissed. Walls would also be sentenced to time already served in jail.

¶ 14    Walls testified that he had known both defendant and Ray for about five to seven years. On the evening of October 20, 2016, he met up with defendant in Glendale Heights. Outside an apartment building, they saw Ray. The three men conversed and soon decided to find a place to smoke indoors. They entered a laundry room in the apartment building's basement. Ray asked Walls and defendant whether either one needed a job. As he spoke, defendant took off his backpack and removed a gun. The gun was chrome and had a black handle. Defendant approached Ray and told him to turn around. He put the gun to the back of Ray's head, told him not to move, and used his free hand to go through Ray's pockets. He removed money, a phone, and cigarettes. Defendant then told Ray to lie on the ground. Ray complied. Defendant put the stolen items into his pocket, and he and Walls left the building.

¶ 15    Walls testified that he and defendant went to James Court to meet up with defendant's friend. The friend was not at home, but defendant hid the gun in a gutter near the garage and put the stolen items into his backpack. A few minutes later, a police officer in a squad car spotted Walls and defendant and told them to stop. Defendant took off running but fell while trying to climb a fence. Walls ran back to James Court, where the police eventually apprehended him.

¶ 16    Walls testified that, on October 20, 2016, he had dreadlocks and was wearing a green hoodie, which he discarded in the chase. He never touched the gun used in the robbery and never took anything from Ray. Walls identified People's exhibit No. 1-A as the gun. He also identified defendant's backpack and the cigarette pack and the phone taken from Ray.

¶ 17    Walls testified on cross-examination that he did not try to stop defendant from robbing Ray. He did not speak to the police on the evening of October 20, 2016. He spoke to the State about a plea agreement only after reviewing discovery with his attorney.

¶ 18    Glendale Heights police officer Monte Bohacz testified that, on October 20, 2016, he drove to the Brunswick Zone, walked up to the entrance, and spoke to Ray. He learned that Ray had been the 911 caller. He obtained Ray's descriptions of the two suspects, which he relayed to other officers. When the suspects were taken to the Brunswick Zone, Bohacz drove Ray to the area, instructed him on the show-up procedure, and then asked him whether he could identify either one. From the backseat of the squad car, Ray saw defendant, became very upset, and yelled several things at defendant, including, "I'm going to smoke you." Ray was angry, but he did not seem scared at any point. After Ray calmed down, he identified defendant as one of the perpetrators.

¶ 19    Bohacz testified that he drove Ray to the police station, where Bohacz and Sheehan interviewed Ray. The interview was recorded. The video was played in court. In the interview, Ray stated that he had been visiting his friend Shay in her apartment in Glendale Heights. He

stepped outside to smoke. Two men approached him and started talking to him. One, Tim, who was wearing a green sweater, reminded him that they had spent some time together a few years ago. He showed Ray what he claimed were drugs. The other, "Sayvon," was also an acquaintance from several years ago. The men said that they were cold and wanted to go inside, so Ray walked them to the apartment building's basement laundry room. After no more than 40 seconds, Sayvon put a gun to the back of Ray's head, and Tim went to the door. Sayvon told Ray, "I need all your shit. Give me your shit." Ray responded, "Are you serious?" Sayvon grabbed Ray and pushed him, saying, "You want to die?" and, "I'll pull this motherfucker." He and Tim took Ray's phone and some money and ran out. Ray exited and started to chase them, then went to the Brunswick Zone and called 911. A short time later, he rode in a squad car and viewed two men. He identified one as Tim, in the green sweater, and the other as Sayvon, in the gray sweater. Asked whether he ever saw Tim with a gun, Ray said no.

¶ 20    Bohacz testified that he and Hawco inventoried defendant's belongings. From his backpack, they recovered a cigarette pack and a cell phone.

¶ 21    Sheehan testified as follows. After defendant had been apprehended, Sheehan interviewed him at the hospital, where defendant was being treated for a leg injury. Defendant told him that, after he and Walls accompanied Ray to the laundry room, Walls produced a handgun, pointed it at Ray, and took a bag of pills from Ray's pocket. Defendant took a pack of cigarettes, a cell phone, and some change. He denied that he ever pointed the gun at Ray, but he admitted that he handled it before the robbery. He told Sheehan correctly where the gun was hidden after the robbery. Later, defendant gave a recorded interview at the police station. His account of the robbery was mostly consistent with what he said at the hospital.

¶ 22 The trial court admitted a certified copy of defendant's 2015 felony conviction of criminal trespass to a residence. Defendant put on no evidence. After hearing arguments, the court found defendant guilty of armed robbery while armed with a firearm and unlawful possession of a firearm by a felon. On the latter charge, the court noted that (1) defendant had admitted to handling the gun and (2) his fingerprint was found on it. Moreover, in the 911 call, Ray's description of the man who pointed the gun at him matched defendant. Walls also testified that defendant put the gun to Ray's head.

¶ 23 On the armed robbery charge, the court found as follows. Ray's testimony was evasive, but he did state that defendant took money, cigarettes, and a cell phone from him. Moreover, defendant admitted that he was present during the robbery, making him at least an accomplice. However, the evidence proved that defendant was the principal. In his 911 call, Ray said that defendant had robbed him at gunpoint, and the cigarette pack and the cell phone were found in defendant's backpack. In the videotaped interview, Ray stated that defendant put the gun to his head and asked him "[D]o you want to die?" Further, Walls testified that defendant put the gun to Ray's head and took those items from him. Finally, defendant's fingerprint was recovered from the gun, but no other prints were found on it. Defendant gave Sheehan an accurate description of the gun and knew where it had been discarded.

¶ 24 The case proceeded to sentencing. The presentencing investigation report (PSIR), dated July 16, 2019, stated in pertinent part as follows. Defendant did not submit a written statement for this case, but he told the investigating probation officer that he had been drinking with a " 'used to be friend' " who put something in his drink that made him black out so that he did not remember what happened. Defendant also said that, in the past, he had been pressured by his peers into doing things that he did not want to do and that this case was " 'a big eye opener' " for him.

¶ 25    The PSIR stated that, in 2015, defendant was convicted of criminal trespass to a residence, based on an incident of January 12, 2015. He was sentenced to two years' conditional discharge, and, in 2016, several petitions to revoke conditional discharge had been filed, the latest based on the present case. Defendant also had a 2012 misdemeanor theft conviction and a 2013 misdemeanor conviction of unlawful possession of cannabis. The theft was originally charged as a felony, and defendant was sentenced to probation, which he satisfactorily completed.

¶ 26    The PSIR stated that defendant was born in Chicago on July 23, 1993. When he was in sixth grade, his parents separated, and he had little contact with his father thereafter. Defendant moved with his mother to Du Page County when he was 14 or 15. He graduated high school in 2012 and spent a semester in college to improve his reading and writing skills. His employment history was nil. He started to use cannabis when he was a senior in high school, and he was soon using it daily. Defendant completed outpatient treatment in 2014 but soon relapsed.

¶ 27    The public defender's office submitted a "Mitigation Report" dated October 2019. It stated in part as follows. Defendant's childhood home in Chicago had very high levels of lead contamination; although he was never treated for any effects, lead poisoning frequently affects the brain development and behavior of children. As a small child, defendant witnessed several shootings, and he was stabbed when he intervened in a fight. At 22, his mother kicked him out of their house because he smoked marijuana all day. He moved to Chicago but returned to live with his mother. Defendant had a chronic learning disability, but his mother had refused to allow his schools to provide special services because she did not want him stigmatized.

¶ 28    The trial court admitted a letter from defendant's mother, who related that her Chicago apartment had extremely high levels of lead and that defendant's younger brother had been diagnosed with severe lead poisoning.

¶ 29    The trial court also heard recordings of phone calls that defendant made from jail.[1]  On May 7 and 8, 2019, defendant spoke with "Darrell" and provided him with several phone numbers to call in connection with the case.  On June 23, 2019, defendant spoke with a person, apparently "Darrell" again, telling him in part, "I'm sending motherfuckers to go see Christ when I get home."

¶ 30    At the sentencing hearing, Glendale Heights police officer Brad Malloy testified as follows. On January 12, 2015, he was dispatched to a hotel room where Mayela Perez was residing.  Several other officers were there.  Malloy learned from Perez and Jarrett Ferguson that they had just been robbed.  A friend named Jose came over; when he knocked and Perez opened the door, defendant, whom she had known for years, forced his way in and pushed her out of the way.  Defendant was accompanied by two other men.  Perez said that he had a gun but did not point it at anyone. Defendant stole a cell phone and cash from Perez and a gift card and some checks from Ferguson. At the police station, Perez said that defendant had robbed her before.

¶ 31    After hearing arguments, the trial court stated as follows.  One factor in aggravation was the circumstances of the offense.  Defendant put a gun to Ray's head and asked him "do you want to die."  Furthermore, he ran from the scene and hid a loaded gun in the gutter of a garage as he fled from the police.  The second factor in aggravation was defendant's criminal record. Considering only those dispositions resulting in a finding of guilt, the court noted the 2015

---

[1] Defendant's appellate brief omits any mention of the calls.  The State's brief describes the calls and argues that they support affirming defendant's sentence.  Defendant's reply brief does not respond to this argument or, indeed, mention the calls at all.

conviction of criminal trespass to residence, a Class 4 felony. Also, a felony arrest for theft was reduced to a misdemeanor and the case was satisfactorily terminated.

¶ 32    The third factor in aggravation was defendant's character and attitude toward the offense. Defendant's claim that a "friend" put something in his drink and made him black out showed that he "still [did] not take accountability for his actions." Also, defendant had told Sheehan falsely that Walls was the gunman in the robbery. Further, in 2015, defendant committed a robbery, perhaps an armed robbery, which tended to prove that he was likely to commit further serious crimes. Finally in aggravation, defendant had essentially no history of employment.

¶ 33    In mitigation, the court noted first that defendant was only 25 years old and that his parents had divorced when he was in grade school. Defendant was still close to his mother. He had completed high school. Further, he was "most likely subjected to lead poisoning" in his early youth in Chicago. Defendant suffered developmental disabilities and his mother refused to let him receive special instruction, and he spent a semester in college to obtain needed help. Further, he had long used marijuana to combat the great stress that he faced, and he had made some attempts at treatment. Finally, defendant had suffered great trauma early in his life, including witnessing a stabbing and several shootings.

¶ 34    The trial court sentenced defendant to 24 years for armed robbery while armed with a firearm and 5 years for unlawful use possession of a firearm by a felon. Later, the court denied his motion to reduce his sentences. He timely appealed.

¶ 35                                        II. ANALYSIS

¶ 36    On appeal, defendant contends that his sentence for armed robbery while armed with a firearm is excessive. Defendant acknowledges that, with the mandatory 15-year add-on, the sentence is only 3 years more than the minimum and 21 years short of the maximum. In contending

that this sentence is excessive, defendant argues along two lines. First, he contends that, because even the minimum sentence is so severe, the factors in aggravation and mitigation favor him. Second, he contends that his sentence is greatly disproportionate to the negotiated disposition of Walls' case. The State responds that the trial court did not abuse its discretion in weighing the pertinent factors and that Walls' case was not a touchstone for defendant's sentencing. For the reasons that follow, we agree with the State.

¶ 37    We shall not disturb a sentence within the statutory range unless the trial court abused its discretion. *People v. Stacey*, 193 Ill. 2d 203, 209-10 (2000). A sentence will be deemed excessive only if it is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of the offense. *Id.* at 210. We may not substitute our judgment for the trial court's merely because we may have differently weighed the pertinent sentencing factors. *People v. Rathbone*, 345 Ill. App. 3d 305, 313 (2003). If mitigating evidence was before the trial court, we presume that the court considered it. *People v. Bruce*, 299 Ill. App. 3d 61, 68 (1998). Given these standards, we cannot say that the trial court abused its sentencing discretion.

¶ 38    As noted, with the mandatory add-on, the sentencing range for armed robbery with a firearm is 21 to 45 years' imprisonment. Defendant received only 3 years more than the minimum but 21 years less than the maximum. Thus, his argument that his sentence was too severe would appear counterintuitive, to say the least. Defendant is correct that 21 years' imprisonment would still be a very substantial punishment, but it does not follow that 24 years is unreasonably long.

¶ 39    We cannot say that defendant's sentence is greatly at variance with the spirit and purpose of the law or manifestly disproportionate to the nature of his offense. This is especially so in light of the substantial factors in aggravation that the trial court properly found.

¶ 40   First, the circumstances of the offense went beyond the bare elements of the charge.  A person commits armed robbery with a firearm, as charged here, when he commits robbery and carries on or about his person or is otherwise armed with a firearm.  720 ILCS 5/18-2(a)(2) (West 2016).  Defendant did not merely carry a gun but put it to Ray's head and threatened to kill him. Moreover, defendant sought to escape the police and hid a loaded gun where some person, possibly him or Walls, could have recovered it.

¶ 41   Second, defendant committed a similar and serious offense less than a year before the robbery of Ray.  He and two accomplices invaded a residence and robbed two people; according to one of the victims, he had a gun.  Armed or not, he surprised and terrorized the victims. Although the case was resolved as a criminal trespass to property, the court noted that it was a robbery and likely an armed robbery.

¶ 42   Third, the court noted that defendant's attitude toward his crime did not augur well for his rehabilitative prospects.  In his presentence interview, defendant invented a story to escape responsibility for his act and had lied to the police in an attempt to shift the primary responsibility for the offense to his accomplice.

¶ 43   Defendant does not contest that the foregoing factors were proper, but he attempts to minimize their significance.  His attempts are unconvincing, if not disingenuous.

¶ 44   First, defendant notes that no shots were fired and nobody was injured during the robbery; that the victim knew his attackers; and that Ray was not interested in pursuing charges and was "a reluctant witness."  Defendant concludes that "[t]here was nothing particularly outrageous or unusual about this armed robbery with a firearm compared to others."

¶ 45   The short answer to this argument is that there is nothing particularly severe about this sentence for armed robbery with a firearm, as it is far closer to the legal minimum than to the

maximum. More specifically, at best, defendant is merely asking us to reweigh the evidence. That is not our province.

¶ 46 Worse, defendant's characterization of the offense is implausible. It ignores that he put the gun to Ray's head and threatened to kill him. Next, it makes an arbitrary distinction between being robbed by a stranger and being robbed by two people who used their friendship with the victim to set him up. Finally, it assumes that Ray's reluctance to testify meant that he did not view the offense seriously. But much more probable is that Ray's reticence came from his fear of retaliation, as defendant promised in his calls to "Darrell" (apparently his brother). Directly after the robbery, Ray was not reluctant to pursue charges; in fact, he literally pursued defendant and Walls, despite the danger. Failing to catch them, he called 911, spoke to the police outside, and identified defendant. His rage at defendant did not reflect a desire to let the case go away.

¶ 47 Second, defendant argues that he cooperated with the police after his arrest. Aside from omitting that he fled the police and hid the gun *before* his arrest, defendant mischaracterizes his "cooperation." He spoke to the police to shift most of the blame to Walls—by lying. Defendant admitted having taken items from Ray, but the police had already found these items in his backpack. The "cooperation" that defendant provided was a legitimate factor in aggravation, not mitigation, as the trial court found.

¶ 48 Third, defendant characterizes his January 2016 criminal trespass to a residence as nonviolent. That might be technically accurate, but there is no denying the infliction of terror on the victims, who were threatened with mob violence (even if defendant had been unarmed).

¶ 49 Defendant also reiterates the factors in mitigation that the trial court considered: his youth, his educational achievements, and the serious disadvantages that he suffered growing up. The trial court thoroughly discussed these factors and gave them the weight the court considered

appropriate. They explain why defendant's sentence was less severe than it could have been, but they provide no basis on which to reduce it.

¶ 50 In sum, defendant's argument that the trial court abused its discretion is meritless.

¶ 51 We turn to defendant's alternative argument. He contends that Walls's far shorter sentence shows that his sentence is excessive. Defendant's argument is ambiguous if not inconsistent. He acknowledges the general rule that it is not proper to compare a sentence imposed on a codefendant who pleads guilty per an agreement to a sentence entered after a trial. See *People v. Caballero*, 179 Ill. 2d 205, 217 (1997); *People v. Scott*, 2012 IL App (4th) 100304, ¶ 25. Yet, citing authority for the general principle that similarly situated defendants should not receive grossly disparate sentences, he engages in just such a comparison. Defendant relies heavily on *People v. Milton*, 182 Ill. App. 3d 1082 (1989), a pre-*Caballero* opinion that he contends supports his disparity-of-sentences argument. But see *Scott*, 2012 IL App (4th), ¶¶ 27-29. (*Milton* was not decided on ground of disparity of sentences but on ground that defendant's sentence was inherently excessive). In any event, this case falls within *Caballero*. Walls pleaded guilty; defendant went to trial. Moreover, given the numerous factors in aggravation, there is no unfairness in a sentence well toward the low end of the statutory range. Whether Walls received a windfall, as defendant suggests, is simply not an issue in this appeal.

¶ 52 III. CONCLUSION

¶ 53 For the reasons stated, we affirm the judgment of the circuit court of Du Page County.

¶ 54 Affirmed.